**FILED**

**March 4, 2025**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| SANTRISE WHITE, BERCLINE MILCENT, MONIQUE SPRINGER, GIRAM SANCHEZ, DANIELLE PARIS, and JORGE LEZCANO, | § § § § § § | Civil Action No. 4:24-cv-00935-O |
| individually and on behalf of all others similarly situated, | § § § § | JURY TRIAL DEMANDED |
| *Plaintiffs,* | § § | CLASS ACTION PURSUANT TO FED. R. CIV. P. 23(b)(2) and (b)(3) |
| v. | § § | |
| AMERICAN AIRLINES, INC., | § § | |
| *Defendant.* | | |

---

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

---

TO THE HONORABLE REED O'CONNOR:

Plaintiffs —Santrise White, Bercline Milcent, Monique Springer, Giram Sanchez, Danielle Paris, and Jorge Lezcano—bring this action individually and on behalf of all other adversely affected employees with disabilities (collectively "Plaintiffs and the Members of the Putative Classes") who work or have worked for American Airlines, Inc. ("American Airlines"), and are adversely affected by American Airlines' policies and procedures pursuant to Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101–213 (the "ADA").

# I.
# OVERVIEW

1.     Plaintiffs bring this action, individually and on behalf of all others similarly situated, against American Airlines alleging violations of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101–213 (the "ADA").

2.     American Airlines as has a policy and procedure or pattern and practice of refusing to engage in the interactive process with employees as required under the ADA.

3.     American Airlines' blanket policy of refusing engage in the ADA interactive process results in the failure to accommodate employees with disabilities, penalization for protected absences, unlawful termination of employment, and unlawful refusal to hire qualified and productive employees with disabilities.

4.     Plaintiffs and the Members of the Putative Classes seek injunctive and equitable relief enjoining the practice of refusing to engage in the interactive accommodation process.

5.     Supplemental and secondary to the equitable relief, Plaintiffs seek compensatory and putative damages from American Airlines.

6.     Plaintiffs request that the Rule 23 classes be certified as defined herein, with Plaintiffs named as the Class Representatives of each.

## II.
## THE PARTIES

7.     White is an employee of American Airlines. She has worked for American Airlines at its San Antonito, Texas location and its Dallas/Fort Worth, Texas location.

8.     Plaintiff Bercline Milcent was an employee of Defendant American Airlines and was employed at the time her cause of action accrued. She worked for American Airlines at its Dallas/Fort Worth, Texas location.

9.     Plaintiff Monique Springer is an employee of Defendant American Airlines and was employed at the time her cause of action accrued. She works for American Airlines at its Dallas/Fort Worth, Texas location.

10.     Plaintiff Giram Sanchez was an employee of Defendant American Airlines and was employed at the time his cause of action accrued. He worked for American Airlines at its Dallas/Fort Worth, Texas location.

11.     Plaintiff Danielle Paris is an employee of Defendant American Airlines and was employed at the time his cause of action accrued. She works for American Airlines at its Dallas/Fort Worth, Texas location.

12.     Plaintiff Jorge Lezcano is an employee of Defendant American Airlines and was employed at the time his cause of action accrued. He works for American Airlines at its Fort Lauderdale, Florida location.

13.     The Members of the Rule 23(b)(2) Class ("Injunctive Class") are current employees and former employees of American Airlines who: (1) have disabilities within the meaning of the ADA, 42 U.S.C. § 12102(1); (2) are qualified under the ADA,

42 U.S.C. 12111(8); and (3) are subject to American Airlines' illegal policies regarding reasonable accommodations.

14.     The Members of the Rule 23(b)(3) Class ("Damage Class") are current employees and former employees of American Airlines who: (1) have disabilities within the meaning of the ADA, 42 U.S.C. § 12102(1); (2) are qualified under the ADA, 42 U.S.C. 12111(8); and (3) have been adversely affected by American Airlines' ADA violating policies and procedures.

15.     Defendant American Airlines, Inc. is a Delaware for-profit corporation, headquartered in Fort Worth, Texas, licensed to and doing business in Texas, and can be served with process through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, TX 79701-3218.

### III.
### JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1331 as this is an action arising under 42 U.S.C. § 12101.

17.     This Court has general personal jurisdiction over American Airlines because it maintains its principal office and Texas and Texas qualifies as its home state.

18.     This Court has specific personal jurisdiction over American Airlines because the cause of action arose within this District as a direct result of American Airlines conduct within this District.

19. Venue is proper in the Western District of Texas because this is a judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

20. Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391.

## V.
## FACTS

21. American Airlines is a major US-based airline headquartered in Fort Worth, Texas. American Airlines' policies and procedures violate the ADA and adversely affect their disabled employees who benefit from its protections.

### Santrise White

22. White has been employed by American Airlines since approximately January 2015.

23. Despite her disability, White is qualified and able to perform the essential duties of her position under the ADA, 42 U.S.C. 12111(8) because she can perform the duties of her job with reasonable accommodation.

24. American Airlines offered White the position of Customer Service Representative ("CSR") in January 2015 at its Dallas/Fort Worth, Texas ("DFW") location.

25. A chronic symptom of White's disability is lymphedema (swelling due to build-up of lymph fluid) in her legs.

26. In April of 2019, White requested accommodations related to her lifetime disability, including White requested to be permitted to wear tennis shoes, which were ordinarily against American Airlines' dress code.

27. While in San Antonio, White was granted accommodations which allowed her to wear a full leg cast on her left leg and a size 11 tennis shoe on her left foot (as opposed to a dress shoe).

28. If she became fatigued, teammates would step in to assist her, a practice known and accepted by both her crew and management.

29. American Airlines furloughed White during COVID.

30. White returned from furlough on April 5, 2021, at American Airlines' San Antonio location.

31. To be closer to medical specialists, White requested a transfer from the American Airlines San Antonio location to the DFW location.

32. White requested that the accommodations transfer with her.

33. American Airlines granted the transfer request and White began working at American Airlines' DFW location shortly after the returning from furlough.

34. At the DFW location, American Airlines refused to continue White's accommodations and placed White on a mandatory (involuntary) medical leave.

35. American Airlines ignored White's request and failed to engage in the interactive process with her.

36. White requested a transfer to a clerical position where she could perform administrative work as an accommodation for her disability.

37. Again, American Airlines ignored White's request and failed to engage in the interactive process with her.

38. As a result of American Airlines' refusal to engage in the interactive process and provide reasonable accommodation, American Airlines left White with no option but to take a disability leave.

39. In February 2022, White met with Gail McLean, a Customer Service Manager.

40. McLean informed White she was subject to termination for excessive absences due to her disability. White again requested accommodation for her disability.

41. White's union representative told her from experience that getting an accommodation at American Airlines was nearly impossible, saying that the only way to get an accommodation at American Airlines was to "have HIV."

42. American Airlines has a system that refuses to grant accommodations except in extreme cases.

43. On April 4, 2022, American Airlines denied White's request for accommodation.

44. American Airlines asked White to provide further medical documentation for the purposes of sustaining an "additional medical leave," changing the subject from accommodation that would allow White to continue being productive for American Airlines.

45. White clarified that she was not requesting medical leave, rather she was requesting reasonable accommodations for her lifetime disability to continue to provide high quality performance.

46.     Between April 4, 2022, and October 3, 2022, American Airlines made multiple redundant requests for White to provide additional medical documentation and complete various forms even though there was no change in her medical conditions nor the related accommodations that were being requested.

47.     American Airlines provided White with ADA paperwork for the first time on or about June 29, 2022, with the instruction for White to apply for positions that she could perform with restrictions, instead of allowing White to continue in her position.

48.     White complied with the instructions. Between June 29, 2022, and December 2022, White applied for thirteen positions with American Airlines for which she was qualified and in which she could perform her essential duties with her restrictions.

49.     American Airlines ignored or rejected White's applications until about December 17, 2022, when American Airlines offered White a position that would accommodate her restrictions as a Traffic Management Coordinator ("TMC").

50.     White returned to work for American Airlines on January 3, 2023, almost two years after her request for accommodation at the time of her transfer in April 2021.

51.     American Airlines' treatment is not unique to White.

52.     American Airlines has a history and a practice of systemically failing to engage in the interactive process with its disabled employees requesting reasonable

accommodations, including delay tactics; direct denial of requests for reasonable accommodations; and even termination of some of its disabled employees.

53. American Airlines has a history and a practice of systemically forcing disabled employees to apply for FMLA leave and instructs management to not inform employees or consider accommodations under ADA for disabled employees.

54. White was repeatedly forced onto medical leave and denied positions despite her applications.

55. White was not assigned an ADA coordinator to help her find a new position.

*White's Ongoing Advocacy for Employees with Disabilities*

56. In May 2023, American Airlines transferred White to a Shared Coordinator position, working jointly with TMSC and ARC (American Airlines' Absence and Return Centre), where she processed FMLA and ADA paperwork.

57. Reviewing the paperwork, White could see American Airlines violating the ADA.

58. Between April and June 2023, White raised concerns with her manager Diane Owens, Lead over ARC department, about employees with disabilities being inappropriately directed to FMLA rather than being considered for or informed about their rights under ADA.

59. White raised concerns that Case Managers were not trained to recognize when someone should be considered for and informed about ADA accommodations.

60.    White also said that Case Managers should be provided training and "trigger words" to help them identify when an employee should be recommended accommodations under ADA.

61.    Owens acknowledged White's concerns.

62.    White spoke with multiple ARC Case Managers, including Diane White, Peggy Smith, and Auburney Graves, who confirmed they were instructed "not to encourage ADA" when processing employee medical documentation.

63.    The Case Managers are the first point of contact for employees with disabilities who send in medical documents related to their disabilities.

64.    The Case Managers acknowledged that employees who should be considered for ADA accommodations were instead being forced onto FMLA leave.

65.    The Case Managers admitted to White that when processing paperwork indicating "lifetime" or "chronic" conditions, or when seeing employees submit FMLA paperwork for the same condition year after year, they recognized these employees should be considered for ADA accommodations rather than FMLA leave; however, they were instructed in meetings "not to speak about ADA" and "not to encourage ADA" when interacting with employees.

66.    The Case Managers further revealed they were instructed that even if they recognized an employee qualified for ADA accommodations, it was "not their role to bring it up first," and they were prohibited from transferring calls to the ADA department.

67.     The Case Managers acknowledged that this practice forced employees to suffer unnecessarily, admitting "we make our employees suffer" by keeping them on FMLA rather than informing them of their ADA rights.

68.     In October 2023, White met with Owens' manager, Lisa Harris, Senior Manager of ARC, to discuss the systemic gap between operations and management regarding employees with disabilities who need ADA accommodations.

69.     During this meeting, White detailed her personal experience of having to fight for three years unaware of her rights under ADA, being forced to conduct independent research, and ultimately having to file an EEOC claim before receiving accommodation.

70.     White explained she wants to prevent this from happening to other employees with disabilities. Through her role, White knows this is still happening.

71.     White explained that American Airlines has deliberately buried its ADA accommodation request form deep within its internal website, requiring employees to navigate through eighteen different clicks to locate it.

72.     White suggested training and education for both management, including Case Managers, and employees of the obligations and rights of both parties under the ADA.

73.     White explained to Harris that forcing employees onto medical leave, rather than providing accommodations that would allow them to continue working, often exacerbates their disabilities and mental health – as she had experienced firsthand. She emphasized that maintaining employment is crucial for employees

with disabilities as extended leaves of absences, in lieu of reasonable accommodation such as modified duties or reassignment, can lead to idle time and mind, isolation, and a decline in mental well-being.

74.  White explained to Harris that employees on medical leave are being systematically excluded from job opportunities because their employee portals showed "On Leave of Absence" status, effectively preventing them from obtaining reassignment positions.

75.  Harris acknowledged these systemic issues and referred White to her manager, Drew Cashatt, Head of ADA.

76.  On October 16, 2023, White met with Drew Cashatt, Head of ADA, to discuss the same issues she raised with Owens and Harris, including increasing awareness of ADA rights and accommodations within American Airlines.

77.  Cashatt was evasive during the meeting and claimed he "didn't see where the disconnect is" despite White's detailed examples of systematic patterns, practices, and failures she had observed and documented at American Airlines, including American Airlines:

    a.  instructing Case Managers to not inform employees of ADA rights;

    b.  forcing employees with disabilities onto FMLA leave rather than informing them about and providing accommodations under ADA where appropriate;

    c.  creating artificial barriers to reassignment by marking employees as "On Leave of Absence," which is then seen by prospective managers when making the hiring decision; and

d. creating artificial barriers to reassignment by **not** providing employees with an ADA coordinator to help them find a new role;

e. deliberately burying its ADA accommodation request form deep within its internal website far from easy access and visibility; and

f. failing to engage in the interactive process required by the ADA.

78. Following these meetings, in a subsequent gathering with Case Managers and Leads, Lisa Harris explicitly instructed that "if an employee has a chronic or lifetime illness, that's still an FMLA case," demonstrating American Airlines' continued policy and practice of directing disabled employees to FMLA rather than ADA accommodations.

79. This was in direct response to White's ongoing advocacy and efforts to resolve the systemic ADA violation issues plaguing American Airlines.

80. Through her position processing accommodation requests, White directly observed numerous instances of employees with chronic and lifetime conditions and disabilities being denied FMLA due to technical paperwork issues, while never being informed of their ADA rights.

81. On December 5, 2023, during a conference call with White, Danielle Paris, Monique Springer, and others, Carlos Weathers, the Local Vice President of the Union in DFW, confirmed American Airlines' discriminatory practices. When asked how American Airlines supports employees with disabilities, Weathers said that in his meeting with American Airlines, they told him they do not provide ADA accommodations.

## Bercline Milcent

*Background and Qualifications*

82.   Milcent is a qualified individual with disabilities under the ADA.

83.   Milcent suffers from gastrointestinal issues and irregular bowels, requiring frequent and urgent restroom access.

84.   Despite her disability, Milcent is qualified and able to perform the essential duties of her position under the ADA, 42 U.S.C. 12111(8) because she can perform the duties of her job with reasonable accommodation.

85.   American Airlines refuses to engage in the interactive process and reasonably accommodate Milcent.

*Employment History and Initial Accommodation Requests*

86.   American Airlines hired Milcent on January 11, 2016, in the reservations department as a Customer Sales Representative.

87.   In this role, Milcent performed clerical desk work in a building near the Dallas-Fort Worth airport.

88.   In 2017, Milcent underwent duodenal switch surgery (a type of gastric bypass).

89.   Following the surgery, Milcent developed "Dumping Syndrome," a condition that causes food to move quickly from the stomach to the small intestine.

90.   Due to this condition, Milcent requires urgent, frequent and unpredictable restroom access.

91.    Her condition is permanent and she continues to manage its effects to this day.

92.    Additionally, Milcent developed multiple hernias due to post-surgical complications, requiring additional procedures in 2019, 2020, 2021, and 2022.

93.    In the reservations department, Milcent was approved for intermittent FMLA leave.

94.    In the reservations department, Milcent worked a desk job near restroom facilities, allowing her to manage her condition without requiring additional accommodations under the ADA.

*Transfer to DFW Airport and Worsening Condition*

95.    In March 2022, Milcent was transferred from reservations to the DFW airport as a Customer Service Agent.

96.    The new role was significantly more physically demanding, requiring her to stand for long periods, lift luggage, and move frequently.

97.    Milcent's hernia worsened due to the physical strain.

98.    She underwent multiple surgeries to address the issue but continued to experience complications.

99.    She continued to experience issues with flareups and swelling.

100.    Additionally, her medical condition caused urgent and unpredictable episodes requiring immediate restroom access, particularly 10 to 15 minutes after meals and resulting in 3 to 4 bathroom visits per day.

101. Instead of providing reasonable accommodations, such as necessary breaks or seated duties, American Airlines forced her to either work without accommodation or take FMLA leave.

102. Non-FMLA absences resulted in attendance points even if absence is due to a disability.

103. To avoid attendance points, Milcent had to repeatedly seek approval for intermittent FMLA leave through her physician, Dr. Kylie Roberts.

104. Since modified work duties were not an option, Milcent attempted to manage her condition by reducing her schedule to part-time, working 4-hour shifts.

105. However, American Airlines regularly mandated overtime up to 12 hours citing operational needs and later changed their policy to require part-time employees to work 6-hour shifts five days a week.

106. When faced with these extended hours that exacerbated her medical condition, Milcent's only option was to use FMLA leave as prescribed by Dr. Roberts.

107. American Airlines was intimately aware of Milcent's disabilities.

108. Milcent was left with no option but to switch to part-time hours and take days off to manage her disabilities.

109. American Airlines maintained service center positions that would have better accommodated her medical needs by allowing seated work.

110. These positions were restricted to employees with on-the-job injuries, limited to temporary light duty assignments with restricted hours, and required successful schedule bidding.

111.    American Airlines did not offer these positions to Milcent.

112.    American Airlines failed to inform Milcent about modified duties options or discuss potential accommodations.

*American Airlines' Failure to Accommodate Disability-Related Absences*

113.    Milcent was aware that American Airlines enforced a "100% work or no work" policy and practice.

114.    Milcent was aware that American Airlines did not allow employees to work with modified duties or schedules.

115.    Consequently, she relied on FMLA leave to take intermittent days off as medically needed.

116.    Throughout 2022 and 2023, she submitted FMLA approved and disability related absences whenever she experienced medical issues including flare-ups and excessive leg swelling.

117.    Milcent reported absences through American Airlines' reporting system, WorkBrain, selecting "sick" as the reason.

118.    WorkBrain displayed her available FMLA hours, and she only took leave when hours were available.

119.    Throughout 2023, she repeatedly contacted the Time and Attendance department to confirm her FMLA submissions through WorkBrain; each time she assured that her leave was approved.

120.    This included phone calls and e-mails to and from Customer Service Manager Wiley Lindsey confirming her good standing regarding FMLA absences.

121. On July 11, 2023, Milcent was called into a meeting with Customer Service Manager Kaylin Ortolla regarding her ongoing FMLA status.

122. Ortolla stated that Milcent's most recent absences on June 15 to 21, 2023, under FMLA, had been declined due to a missed deadline for submitting updated FMLA medical documentation.

123. Milcent clarified that her doctor had been on vacation and that she had already informed the Time and Attendance office of this in advance and sought an extension.

124. After confirming this in writing with Time and Attendance, Milcent forwarded the confirmation email to Ortolla and spoke with her in person on July 12, 2023, confirming that Time and Attendance gave her an extension until July 14, 2023, to provide the updated FMLA medical documentation.

125. Milcent provided the updated FMLA medical documentation to American Airlines before July 14, 2023.

126. A few days later, Milcent was informed that she needed to attend a "Recap Meeting" with Gail McLean, Customer Service and Time and Attendance Manager, on July 31, 2023.

127. Milcent was told that this was a follow-up meeting from her previous meeting with Ortolla.

128. Milcent returned early from vacation early on July 29, 2023, and subsequently contracted COVID-19.

129. She notified McLean via email that she could not attend the July 31, 2023, meeting because she contracted COVID-19.

130. Milcent returned to work on August 3, 2023, and was immediately removed from her work assignments.

131. She was then called into a meeting with McLean, along with union representatives Matthew Flippin and her co-worker scribe Danielle Paris.

132. During the meeting, McLean informed Milcent that she had exceeded her FMLA hours.

133. Milcent was shocked to hear this as she had always ensured she had FMLA time available before submitting requests.

134. This was the first time Milcent had heard about this issue.

135. This issue of "exceeding FMLA hours" was not raised by Ortolla.

136. This alleged discrepancy, if true, was caused by the company reporting system, WorkBrain, which always showed Milcent as having FMLA hours available whenever she took FMLA approved days off due to her disability.

137. American Airlines retroactively recoded previous FMLA-approved absences on June 28, July 3, and July 4, 2023, to "sick."

138. American Airlines did not offer Milcent a Medical Leave of Absence (MLOA).

139. American Airlines then penalized Milcent for her disability related absences by discriminatorily issuing attendance points, retroactively.

140. Milcent's employment was terminated during the same meeting on August 3, 2023.

141. No one from American Airlines informed Milcent of her right to request accommodations under the ADA.

142. No one from American Airlines engaged in the interactive process with Milcent.

143. After the termination, Milcent contacted Union Representative and Vice President Deborah Johnson to dispute the issue.

144. Johnson informed her that American Airlines has a pattern of terminating employees for medical-related absences.

145. Johnson also noted that McLean stated that American Airlines would not reinstate Milcent because she had "over 38 medical incidents."

146. Johnson also noted that McLean stated that "the company wants to hear that the issues causing the attendance issues have been resolved".

147. American Airlines failed to provide an official audit of Milcent's FMLA hours.

148. After her employment termination, American Airlines blocked Milcent's access to the FMLA paperwork she had submitted.

149. In February 2024, Milcent filed an EEOC charge of discrimination against American Airlines for its failure to accommodate her disability and wrongful termination.

150. Milcent was fired because of her disability and disability-related absences.

151. American Airlines failed to inform her of her right to request accommodations under the ADA.

152. American Airlines penalized Milcent and discriminatorily assessed an attendance point for her disability related absences.

153. American Airlines then fired Milcent for the attendance points.

154. American Airlines has refused to engage in the interactive process and American Airlines has refused to reasonably accommodate Milcent.

155. American Airlines' actions demonstrate a pattern of discriminating against and terminating employees with disabilities.

156. Milcent was subjected to unfair treatment and termination due to her disability and disability protected leave

157. American Airlines' refusal to accommodate Milcent directly violated the ADA and FMLA.

**Monique Springer**

*Background and Qualifications*

158. Monique Springer is a qualified individual with disabilities under the ADA.

159. Springer was diagnosed with breast cancer in March 2021 and continues to receive treatment.

160. Springer from chronic migraines and depression.

161. Despite her disabilities, Springer is qualified and able to perform the essential duties of her position under the ADA, 42 U.S.C. 12111(8) because she can perform the duties of her job with reasonable accommodation.

162. American Airlines refuses to engage in the interactive process and reasonably accommodate Springer.

### *Employment History and Initial Accommodation Requests*

163. Springer is currently employed with American Airlines and works as a Customer Service Agent.

164. Springer started working with American Airlines on June 13, 2022, in the reservations department as a Customer Sales Representative following American Airlines merger with Piedmont Airlines.

165. After the transfer, American Airlines recognized Springer's previous tenure of approximately 5 years for the purpose of retirement, but not for the purpose of seniority for schedule bidding or FMLA eligibility.

166. As such, Springer had not been employed long enough to be eligible for FMLA leave.

167. In this role as Customer Sales Representative, Springer performed clerical desk work.

168. Springer was previously diagnosed with brain cancer in March 2021.

169. Springer also suffers from chronic migraines stemming from a major childhood accident, experiencing headaches as much as 15 days per month for a

period of 3 months with symptoms including throbbing with moderate to severe pain, nausea, vomiting, and sensitivity to light.

170. These migraines are triggered and exacerbated by stress.

171. American Airlines' ongoing mistreatment, as described below, creates a vicious cycle where American Airlines' discriminatory mistreatment of Springer's disability related absences causes stress, which in turn worsens her medical condition.

172. These conditions are permanent, and she continues to manage their effects to this day.

173. On July 23, 2022, Springer passed out at work due to an undiagnosed COVID-19 infection.

174. After being found unconscious by coworkers, Springer was transported from work to the hospital by ambulance.

175. Despite providing medical documentation of her hospitalization and COVID-19 diagnosis, American Airlines penalized Springer with an attendance point.

176. American Airlines refused to remove the attendance points even after Springer provided additional medical documentation.

177. When Springer inquired about getting her attendance points reduced and asked for clarification about required medical documentation, an ARC (American Airlines' Absence and Return Centre) Case Manager told her "You people always have something going on."

178. When Springer asked the representative to clarify what was meant by "you people," the representative refused to explain the discriminatory comment.

179. Springer reported absences through American Airlines' absence reporting system, WorkBrain, selecting "sickness" as the reason.

180. The Case Manager would not identify herself despite multiple requests from Ms. Springer. Whenever Ms. Springer asked for her name, she would respond by saying "I've been here for 35 years."

181. Ms. Springer complained about the interaction to another Case Manager named Auburney Graves who was sympathetic.

*Worsening Conditions and Continued Discrimination*

182. From December 18, 2022 to February 8, 2023, Springer experienced severe migraines that required her to take medical leave.

183. Springer provided medical documentation from her healthcare providers regarding this condition.

184. American Airlines denied her Medical Leave of Absence (MLOA) request despite the documentation.

185. American Airlines discriminatorily assessed attendance points for these disability related absences.

186. In March 2023, Springer experienced additional onset of severe migraines requiring disability related absence.

187. Again, American Airlines denied her paperwork and discriminatorily assessed attendance points.

188.   In May 2023, Springer transferred from reservations to the DFW airport as a Customer Service Agent.

189.   From September 18 to October 7, 2023, Springer required additional medical leave due to her disability.

190.   American Airlines penalized her with attendance points, triggering a Level 3 attendance warning.

191.   The accumulation of discriminatory attendance points and resulting stress led to Springer being diagnosed with depression in September 2023.

### *American Airlines' Discriminatory Treatment*

192.   In late 2023, Springer was called into a meeting with Customer Service and Time and Attendance Manager Gail McLean.

193.   During the meeting, Springer told McLean that her absences were related to her disability and questioned why her medical paperwork was constantly denied.

194.   McLean made discriminatory comments to Springer, including "this job is probably not for you", and "you've been out for 50 something days, maybe you shouldn't be working here."

195.   McLean also instructed Springer to "get a different doctor to fill out paperwork properly," despite the fact that her documentation was being completed by both a neurologist and oncologist.

196.   American Airlines repeatedly required Springer to obtain new medical documentation, forcing her to pay $20-25 for each new set of forms.

197. American Airlines refused to accept medical documentation from Springer's specialists, including her neurologist and oncologist.

198. When Springer contacted ARC (American Airlines' Absence and Return Centre) in October 2023 to inquire about the constant denial of her medical documentation, she was informed that no medical professionals were reviewing the paperwork.

199. Despite having no medical training or qualifications, ARC staff repeatedly rejected detailed medical documentation from Springer's board-certified neurologist and oncologist, making vague demand that the specialists make their medical assessments "plainer and clearer" without providing any specific guidance as to which part of the document was unclear or problematic.

200. When Springer's doctor attempted to contact ARC directly to discuss the medical documentation, with Springer present in the doctor's office and giving consent, the ARC Case Manager stated they "cannot talk to you [the doctor] about it" and abruptly hung up.

201. ARC refuses to communicate with the very medical professionals whose documentation it arbitrarily deems inadequate.

202. American Airlines' discriminatory mistreatment forced Springer to miss several cancer appointments throughout 2022 and 2023 because American Airlines refused provide reasonable accommodation to her schedule.

203. Throughout 2022 and 2023, Springer requested a reasonable accommodation to modify her work schedule to allow her to attend critical oncology appointments for her breast cancer treatment.

204. Springer specifically requested to start her shift later on appointment days, explaining to American Airlines that:

    a. these specialist appointments were difficult to obtain;

    b. rescheduling could result in significant delays in her cancer treatment; and

    c. the appointments could not be scheduled outside of her work hours due to limited specialist availability.

205. American Airlines refused.

206. American Airlines summarily denied Springer's request for schedule modification without engaging in any interactive process to discuss potential accommodations.

207. Springer was forced to cancel multiple oncology appointments, disrupting her brain cancer treatment plan.

208. Springer's fear of American Airlines discriminatory penalization with attendance points caused her to prioritize work attendance over necessary medical treatment.

209. The stress of choosing between critical medical care and job security exacerbated Springer's medical conditions, including her depression.

210. American Airlines failed to inform Springer about modified duties options or discuss potential accommodations.

211. American Airlines failed to inform Springer of her rights under the ADA.

212. No one from American Airlines engaged in the interactive process with Springer.

213. Instead of providing reasonable accommodations, American Airlines forced Springer to either work without accommodation or take time off and be penalized with discriminatory issuance of attendance points.

214. American Airlines has refused to engage in the interactive process and American Airlines has refused to reasonably accommodate Springer.

215. American Airlines' actions demonstrate a pattern of discriminating against and terminating employees with disabilities.

216. Springer was subjected to unfair treatment and discrimination due to her disabilities and disability-protected leave.

217. American Airlines' refusal to accommodate Springer directly violated the ADA and FMLA.

### Giram Sanchez

*Background and Qualifications*

218. Giram Sanchez is a qualified individual with disabilities under the ADA.

219. Sanchez suffers from major anxiety disorder and major depression disorder.

220. Despite his disability, Sanchez is qualified and able to perform the essential duties of his position under the ADA, 42 U.S.C. 12111(8) because he can perform the duties of his job with reasonable accommodation.

221. American Airlines refuses to engage in the required interactive process and reasonably accommodate Sanchez.

*Initial Employment and Failure to Accommodate*

222. American Airlines hired Sanchez as a Customer Service Agent on October 31, 2022, at American Airlines' Dallas-Fort Worth, Texas airport location.

223. Shortly after commencing employment, Sanchez began experiencing anxiety episodes.

224. Sanchez was aware of American Airlines' "100% work or no work" policy and practice.

225. Sanchez had not been employed long enough to be eligible for FMLA leave.

226. On January 1, 2023, Sanchez's anxiety caused him to become disoriented, dizzy, and nauseous, at work.

227. Sanchez vomited twice within two hours.

228. Sanchez informed supervisor Gary (can't recall last name) of his anxiety and the accompanying symptoms and requested to go home without being penalized with attendance points under American Airlines' Voluntary Time Off (VTO) policy.

229. At the time of the request, the supervisor could see Sanchez was visibly pale and nauseous.

230. The supervisor asked Sanchez if he was hung over. He was not.

231. Sanchez told his supervisor he had gone to the restroom twice within two hours to vomit.

232.    Sanchez told his supervisor he was having panic attacks.

233.    The supervisor refused to approve Sanchez for VTO, for which he would not be assessed attendance points.

234.    The Supervisor told Sanchez that VTO was not possible for his condition and denied the VTO request.

235.    American Airlines penalized and discriminatorily assessed Sanchez attendance points for going home early.

236.    On January 2, 2023, Sanchez was absent from work for the same reason, his anxiety and accompanying symptoms.

237.    Sanchez reported his absence through WorkBrain, American Airlines' attendance reporting system.

238.    Sanchez listed "sick" as the reason for his absence on January 1 and 2, 2023.

239.    American Airlines' WorkBrain reporting system did not allow Sanchez to specify the type of illness, only that the reason for the missed day was due to being "sick".

240.    American Airlines penalized Sanchez and discriminatorily assessed an attendance point for January 1 and 2, 2023.

241.    On February 1, 2023, Sanchez was absent from work due to this anxiety.

242.    American Airlines penalized Sanchez and discriminatorily assessed attendance points.

243. From May 7 to 9, 2023, Sanchez was absent from work due to this anxiety.

244. American Airlines penalized Sanchez and discriminatorily assessed three attendance points for his absence from work from May 7 to 9, 2023.

245. When Union Representative Matthew Flippin questioned Sanchez on his absence from work, Sanchez told him it was due to his anxiety.

246. Flippin instructed Sanchez to always list "sick" as the reason of the absence if it's related to anxiety, not miscellaneous.

247. Sanchez then informed Flippin that the same was true for his absence on February 1, 2023.

248. Flippin informed Gail Mclean, American Airlines' Customer Service and Time and Attendance Manager, that Sanchez was absent from work from May 7 to 9, 2023, as well as on February 1, 2023, due to anxiety.

249. American Airlines reduced the attendance points assessed for May 7 to 9, 2023, from three to one after learning the reason was "sickness" not miscellaneous.

250. Despite the change, American Airlines still penalized and discriminatorily assessed an attendance point to Sanchez for his disability related absence on February 1, 2023, and an attendance point for his absence from May 7 to 9, 2023.

251. Consequently, in May 2023, American Airlines issued a Level-One attendance warning based on the accumulation of four attendance points.

252.    Following this, he was summoned to a meeting with Gail McLean from Time and Attendance.

253.    Flippin was present and took notes.

254.    Sanchez told McLean about his ongoing issues with anxiety and that it was reason for all three of the attendance points assessed to him in 2023.

255.    Sanchez asked McLean if he could avoid being penalized with attendance points if he provided a doctor's note.

256.    Sanchez also offered to share medical documents confirming his disability diagnosis.

257.    McLean dismissed his disability related concerns, stating, "We don't care about doctors' notes."

258.    McLean further stated that the only way to avoid attendance points is through FMLA approved time off.

259.    McLean made this comment despite being told about Sanchez's anxiety.

260.    American Airlines refused to inform Sanchez that he could request accommodation for his disability condition under the ADA.

261.    Even worse, American Airlines told Sanchez that his disability would not protect him from being penalized with attendance points unless he was approved under FMLA for which he was not eligible at the time.

262.    American Airlines refused to engage in the interactive process under the ADA.

263. Instead, American Airlines insisted that Sanchez's only resource was to file for FMLA approved absence when eligible.

264. The ongoing penalization with attendance points for Sanchez's disability related absences further exacerbating his anxiety.

265. On June 1, 2023, Sanchez was absent from work due to anxiety.

266. Sanchez selected "sick" in WorkBrain.

267. American Airlines penalized Sanchez and discriminatorily assessed an attendance point.

268. In August 2023, Sanchez sustained a workplace injury, resulting in a fractured leg.

269. Due to his fears about being punished with attendance points, he forced himself to work through excruciating pain.

270. As a result, his mental health toke a toll and his anxiety increased.

271. Sanchez missed some days in August and September 2023 due to the leg injury.

272. American Airlines penalized Sanchez and discriminatorily assessed two attendance points.

273. Sanchez had to fight to reverse these points.

274. A Time and Attendance staff member accused Sanchez of faking his injury, stating that "people with fractures go to the hospital."

275. The dispute required multiple managers to intervene, further exacerbating Sanchez's anxiety.

276. American Airlines reversed the two points it assessed for the days missed in September and August 2023 due to the leg injury.

277. Sanchez commenced leave in September 2023 to December 6, 2023, under workers' compensation.

278. Sanchez returned to work on December 7, 2023.

279. In mid-late December 2023, Sanchez experienced severe health issues, including difficulty breathing, high fever, and persistent coughing, leading him to visit the emergency room.

280. Sanchez traded shifts to avoid missing work but called in sick on December 22, 2023 after he couldn't find coverage.

281. Sanchez informed American Airlines of his condition and filed FMLA paperwork.

282. Sanchez selected "sick" in WorkBrain.

283. Sanchez's FMLA request was denied.

284. Sanchez was told that "the flu is not covered".

285. American Airlines penalized Sanchez and discriminatorily assessed attendance points.

286. Sanchez's anxiety worsened.

287. On January 6, 2024, Sanchez was absent from work due to anxiety.

288. Sanchez selected "sick" in WorkBrain.

289. American Airlines penalized Sanchez and discriminatorily assessed an attendance point.

290. From January 19 to 23, 2024, Sanchez was absent from work due to anxiety.

291. Sanchez selected "sick" in WorkBrain.

292. Sanchez was discriminatorily assessed two attendance points, later reduced to one, after reporting sickness.

293. Sanchez asked his doctor to fill out FMLA paperwork, which was submitted.

294. The doctor, who is not a psychologist, listed the symptoms of nausea and vomiting, without specifying anxiety.

295. Sanchez selected "sick" in WorkBrain.

296. American Airlines penalized Sanchez and discriminatorily assessed an attendance point.

297. From February 17 to 20, 2024, Sanchez was absent from work due to anxiety.

298. Sanchez selected "sick" in WorkBrain.

299. Sanchez' doctor provided a note.

300. American Airlines penalized Sanchez and discriminatorily assessed an attendance point.

301. In April 2024, a supervisor harassed Sanchez, spreading rumors about him to co-workers and watching him on camera, which triggered his anxiety.

302. Sanchez was absent from work due to anxiety on April 10 and from April 15 to 17, 2024.

303.   Sanchez selected "sick" in WorkBrain.

304.   American Airlines penalized Sanchez and discriminatorily assessed attendance points.

305.   Every time Sanchez called in sick, American Airlines penalized and discriminatorily assessed attendance points.

306.   No one from American Airlines spoke to Sanchez about his medical issue.

307.   No one from American Airlines informed Sanchez of his right to request accommodations under the ADA.

308.   In fact, Sanchez was explicitly told the opposite: that unless it was an FMLA approved absence, Sanchez would be assessed attendance points for missing days, even if it was due to a disability.

309.   No one from American Airlines engaged in the interactive process with Sanchez.

310.   Sanchez was missing work due to his anxiety but was unaware that he had rights under the ADA or that he could request reasonable accommodations.

311.   Instead, American Airlines penalized Sanchez for his disability related absences by issuing attendance points.

*Termination*

312.   American Airlines did not offer Sanchez any support under ADA.

313.   American Airlines kept rejecting his doctor's FMLA paperwork.

314.    Sanchez's doctor suggested that Sanchez see a psychologist and have the psychologist submit intermittent FMLA paperwork because a psychologist's cite to anxiety as the reason for absence will carry more weight as a specialist.

315.    Sanchez scheduled an appointment with a psychologist to have the FMLA paperwork completed by them since the primary doctor said that was necessary.

316.    Sanchez's appointment with the psychologist was scheduled for June 27, 2024.

317.    Sanchez informed his Customer Service Manager about his disability-related absences, the attendance points he was assessed as a result, and the need for accommodation.

318.    The Customer Service Manager told Sanchez that American Airlines does not care about his condition unless he had FMLA paperwork.

319.    American Airlines fired Sanchez before his appointment to complete the FMLA paperwork with his doctor.

320.    Sanchez informed American Airlines about his upcoming appointment when they were terminating him.

321.    American Airlines terminated Sanchez' on June 7, 2024, after refusing to accommodate his disability or engage in the interactive process.

322.    Two weeks prior to his dismissal, Sanchez informed his Customer Service Manager Blancowhich (can't recall first name), about his disability-related

absences, the attendance points he was assessed as a result, and the need for accommodation.

323. Blancowhich told Sanchez that American Airlines does not care about his condition unless he had FMLA paperwork.

324. During post-termination discussions with Union Representative Local President Deborah Johnson, Johnson asked Sanchez "are you cured from anxiety?"

325. Johnson revealed American Airlines' discriminatory mindset by further when she said that claiming to be "cured" would "look good" and help Sanchez get his job back.

326. Johnson explicitly suggested Sanchez deny his disability to meet American Airlines' discriminatory preference for employees without disabilities.

327. American Airlines fired Sanchez for the attendance points he was assessed in violation of the ADA.

328. American Airlines refused to engage in the interactive process and reasonably accommodate Sanchez.

329. American Airlines' actions demonstrate a pattern of discriminating against and terminating employees with disabilities.

330. American Airlines subjected Sanchez to unfair treatment, retaliation, and termination due to her disability and use of protected medical leave.

331. American Airlines' refusal to accommodate Sanchez directly violated the Americans with Disabilities Act (ADA) and the Family and Medical Leave Act (FMLA).

**Danielle Paris**

*Background and Qualifications*

332.    Danielle Paris is a qualified individual with disabilities under the ADA.

333.    Paris suffers from Lupus and asthma which substantially limit her immune system and respiratory functions.

334.    Despite her disabilities, Paris is qualified and able to perform the essential duties of her position under the ADA, 42 U.S.C. 12111(8) because she can perform the duties of her job with reasonable accommodation.

335.    American Airlines refuses to engage in the interactive process and reasonably accommodate Paris.

*Employment History and Initial Accommodation Requests*

336.    American Airlines hired Paris in February 2015 at its Dallas-Fort Worth location.

337.    Paris works as a Customer Service Agent.

338.    Paris is currently employed with American Airlines.

339.    Paris' conditions cause frequent sinus infections due to workplace conditions, including poor air quality and black mold at the airport.

340.    Due to her compromised immune system and breathing issues from Lupus and asthma, Paris often requires modifications to her work duties and schedule.

341. American Airlines management including those at ARC, are aware that Paris' conditions are chronic and lifetime.

342. American Airlines never informed Paris of her right to request accommodations under the ADA.

343. Instead, American Airlines directed Paris to take FMLA leave whenever her disabilities affected her ability to work.

344. Since 2015, the only options presented to Paris were to either work without accommodations or take time off through FMLA.

*Systemic Denial of ADA Rights*

345. Paris was aware that American Airlines enforced a "100% work or no work" policy and practice.

346. Paris was aware that American Airlines did not allow employees to work with modified duties or schedules.

347. Time and Attendance managers, such as Roy Richichi, repeatedly told Paris "we don't have light duties or ADA accommodations."

348. On December 5, 2023, during a conference call with Paris, White, and others, VP Union Representative Carlos Weathers confirmed American Airlines' discriminatory practices. When asked how American Airlines supports employees with disabilities, Weathers said that in recent meeting he had with American Airlines, they told him they do not provide ADA accommodations.

349. American Airlines maintained this position from 2017 onwards, consistently telling employees they must either perform all duties without restriction or take leave.

350. Consequently, Paris relied on FMLA leave to take intermittent days off as medically needed.

351. American Airlines forced Paris to use her FMLA leave and vacation time when reasonable accommodations could have allowed her to continue working.

352. Paris was never assigned an ADA Coordinator to discuss potential accommodations.

353. Paris was never informed about modified duty options that could have accommodated her disabilities and allowed her to continue working rather than forcing her to take time off when her condition worsened.

*Discriminatory Medical Leave Policies*

354. American Airlines maintains a discriminatory policy requiring employees to take at least four consecutive days of medical leave to qualify for American Airlines Medical Leave of Absence (MLOA).

355. If Paris needed to take less than four days off due to her disabilities, American Airlines would penalize her with attendance points.

356. This policy forced Paris to take longer leaves than medically necessary to avoid attendance points.

357. American Airlines' policy effectively forced Paris to choose between working without accommodations or taking extended leaves to treat her disability, even when shorter leaves or no leave with accommodations would suffice.

358. On July 13, 2023, Paris reported absence through American Airlines' absence reporting system, WorkBrain, selecting "sickness" as the reason.

359. This was a disability related absence due to her asthma.

360. American Airlines penalized and discriminatorily assessed her an attendance point.

361. When Paris attempted to take MLOA in July 2023, Jennifer (last name unknown) from Time and Attendance informed Paris that she was ineligible because she was not taking off four consecutive days.

362. Paris has had to instruct her doctors to write notes for at least four days of leave to avoid being penalized with attendance points.

363. In this way, American Airlines excludes employees with disabilities from the workplace: first by failing to provide necessary accommodations which would keep them working and then by prolonging their absence, which employees are forced to do to avoid being penalized with attendance points.

### *FMLA Issues and Systemic Discrimination*

364. American Airlines systematically mishandled Paris' FMLA hours, repeatedly claiming she was "running out of hours" when she had hours available.

365. In 2023, American Airlines falsely claimed Paris had exhausted her FMLA hours.

366.   Paris was forced to file a grievance to challenge the incorrect calculation of her FMLA hours.

367.   During the grievance hearing with Steven Padgett, Director of Attendance, Paris presented detailed documentation of her FMLA hours.

368.   American Airlines changed Paris' codding to take unpaid voluntary time off instead of paid FMLA leave.

369.   In 2024, Paris discovered American Airlines was incorrectly counting her work schedule gaps as FMLA leave time.

370.   When Paris worked split shifts with a nine-hour gap, American Airlines would count the entire day (19 hours) as FMLA leave instead of just her actual absence time.

371.   This systematic miscalculation of FMLA hours effectively reduced Paris' available leave time.

372.   In early 2024, Paris discovered American Airlines was incorrectly calculating FMLA replenishment dates by requiring employees to wait 366 days instead of 365 days for hours to replenish.

373.   When Paris raised this issue with Time and Attendance supervisor Michael Nweke, he admitted he had never seen this FMLA rule before and had to confirm it with his superiors.

374.   Despite Nweke's verbal confirmation that Paris was correct and promises to retrain staff and send notice to all employees with the correct

information, American Airlines never issued written confirmation of the correct policy and failed to send notice to employees.

375.   This miscalculation of FMLA replenishment dates, along with the ongoing issues of incorrect coding and miscalculation of FMLA hours, further underscores American Airlines' systemic failure to properly train supervisors on employees' rights.

376.   As a result, employees with disabilities are not only forced to take FMLA leave to manage their conditions but also face ongoing issues with its administration.

*Ongoing Discrimination and Failure to Accommodate*

377.   American Airlines' failure to provide accommodations forces Paris to take unpaid FMLA leave when reasonable accommodations could allow her to remain working.

378.   When she doesn't have FMLA time available, she is forced to take at least four days off in order to avoid penalization.

379.   Paris frequently must take time off to receive medical treatments, such as steroid shots, which could be accommodated through modified schedules.

380.   Paris has had to take FMLA leave to obtain necessary medical equipment, such as an asthma pump, when schedule modifications could have accommodated these needs.

381.   In December 2024, when Paris raised concerns about her FMLA hours, a Time and Attendance Manager, Larence Idiata, suggested Paris should "let your

[her] hours build up" before using them, essentially telling her to delay necessary medical care.

382. Paris responded by saying she doesn't have control over when her medical condition exacerbates and that she can't ask her disability to wait until her FMLA hours have built up.

383. American Airlines maintains artificial barriers to accommodation by:

    a. refusing to inform employees of their ADA rights;

    b. forcing employees onto FMLA instead of providing accommodations;

    c. if FMLA is not available, requiring a minimum of four-day absences for medical leave to avoid penalization with attendance points;

    d. mishandling FMLA hour calculations; and

    e. failing to engage in the interactive process.

384. American Airlines' actions demonstrate a pattern of discriminating against and effectively excluding employees with disabilities from the workplace.

385. Paris has been subjected to unfair treatment and discrimination due to her disabilities and use of protected medical leave.

386. American Airlines' refusal to accommodate Paris directly violated the ADA.

### Jorge Lezcano

*Background and Qualifications*

387. Jorge Lezcano is a qualified individual with disabilities under the ADA.

388. Lezcano has cerebral palsy, a permanent neurological condition that affects muscle coordination and movement, particularly on his right side.

389. Lezcano's condition causes:

   a. Significant weakness on his right side, functioning at approximately 50% compared to his left side;

   b. Physical deformity, including a five-inch difference in foot size between his right and left (larger) feet and a noticeable difference in body size between his right and left (larger) side;

   c. Neurological disconnection between his brain's left side and right-side motor functions, requiring additional time and effort to process information and coordinate movements;

   d. Increased strain and fatigue when standing for extended periods or lifting weight.

390. Despite his disability, Lezcano is qualified and able to perform the essential duties of his position under the ADA, 42 U.S.C. 12111(8) because he can perform the duties of his job with reasonable accommodation.

391. American Airlines refuses to engage in the interactive process and reasonably accommodate Lezcano.

*Employment History and Initial Self-Accommodation*

392. Lezcano began working for American Airlines in 2013 at its Fort Lauderdale, Florida Location, following its merger with America West, where he had worked since 2005.

393. He remains employed with American Airlines.

394. Prior to the merger, Lezcano worked for America West since 1999.

395.    At the time of his hire, he was very transparent about his disability and the workplace limitations flowing from his disability.

396.    America West was understanding and accommodating after speaking with his neurologist to confirm his disability, workplace limitations, and ability to perform essential job functions.

397.    American Airlines recognized Lezcano's complete tenure dating back to 1999.

398.    America Airlines knew upon hiring that Lezcano had a disability based on his employee file with America West.

399.    Lezcano initially served as a Customer Service Supervisor at American Airlines for approximately two months before requesting to step down due to the physical demands of the position which required constant back and forth between the counter and gate.

400.    Lezcano told American Airlines the reason he was stepping down.

401.    American Airlines failed to inform to Lezcano about ADA accommodations available in lieu of stepping down.

402.    For years, Lezcano managed his disability through informal self-accommodation by:

    a.  Bidding for gate assignments rather than counter positions which required lifting heavy bags;

    b.  Working night shifts with lower passenger volume and easier bidding opportunity for fate assignments over counter; and

    c.  Avoiding positions requiring extensive baggage handling.

403.    This informal arrangement allowed Lezcano to perform his job duties effectively while managing his disability.

*COVID-19 Policy Changes and Forced Accommodation Request*

404.    During the COVID-19 pandemic, in early 2020, American Airlines implemented new policies requiring employees to work both counter and gate positions during a single shift.

405.    This was significantly different from the previous arrangement which allowed employees to bid for schedules which consisted of either counter or gate assignments during a particular shift..

406.    American Airlines arbitrarily exempted only employees with 45 or more years of service from this requirement.

407.    The new policy eliminated Lezcano's ability to self-accommodate through the bidding process.

408.    The constant rotation between counter and gate positions caused Lezcano significant physical strain, fatigue, and pain.

409.    After attempting to work under these conditions for approximately six months, Lezcano was forced to formally request ADA accommodation in late 2020.

410.    Lezcano formally requested accommodation by way of brief sitting breaks every two hours to rest due to the physical strain of constant standing and movement.

411.    Lezcano provided support medical documentation.

*Discriminatory Response to Accommodation Request*

412.    While American Airlines nominally approved Lezcano's

accommodation request, they:

    a. Unilaterally restricted his work hours to 25 hours per week, prior to which he picked up at least one additional five hour shift per week to meet his financial commitments;
    b. Eliminated his ability to pick up additional shifts. prior to which he picked up at least one additional five-hour shift per week to meet his financial commitments;
    c. Failed to inform him of these restrictions before implementing them; and
    d. Reduced his income by preventing him from working his usual 30 hours per week.

413.    American Airlines publicly identified Lezcano's accommodation status

during the shift bidding process by:

    a. Placing his name in a special column visible to all employees;
    b. Marking him as ineligible for normal bidding; and
    c. Subjecting him to public humiliation and stigma.

414.    The financial impact and public stigma forced Lezcano to withdraw

from his ADA accommodation approximately two months after it was implemented.

*Denial of Alternative Positions and Retaliation*

415.    In June or July 2023, Lezcano applied for a position in American

Airlines' lounge to obtain more seated work in light of his disability.

416.    Lezcano told American Airlines about his challenges in the current role

in light of his disability and said this position would be a great fit.

417.    During the interview process, he told American Airlines that he really

wanted to work this shift in light of his disability and that he thought it was a great

fit.

418.   Despite over 20 years of customer service experience, American Airlines deemed Lezcano "not qualified" for the position.

419.   American Airlines refused to provide any explanation for this rejection despite Lezcano's repeated requests, through e-mails and phone calls, in the following weeks and months following the rejection.

420.   Lezcano repeatedly asked for an explanation for why he wasn't qualified for the role.

421.   American Airlines refused to answer.

422.   Lezcano felt dejected.

423.   When Lezcano questioned HR about potential disability discrimination in the hiring decision, American Airlines, through HR representative Patricia Martinez, dismissed his concerns without investigation.

424.   Lezcano voiced his frustration since he had found a shift he thought was a great fit for him in light of his disability; he was shocked to hear he wasn't qualified in light of his extensive experience.

425.   Following his complaints, American Airlines retaliated against Lezcano by:

   a. Repeatedly assigning him exclusively to counter assignments, while his co-workers were assigned both counter and gate during their shifts, knowing that this assignment adversely impacted him in light of his disability; and

   b. Excluding him from normal rotation between gate and counter duties during the same shift like his peers.

426.    This retaliatory assignment pattern began in late 2023 and continues through 2025.

427.    When Lezcano raised concerns about the lack of rotation with HR:

    a.    HR initially acknowledged he should be rotated;

    b.    HR later reversed position after speaking with local management;

    c.    HR ultimately claimed management could keep him in one position indefinitely.

428.    To manage the physical strain of extended counter assignments, Lezcano has been forced to drop shifts (i.e., sent shifts to co-workers), resulting in further income loss.

429.    This pattern of income loss through forced shift reduction began in early 2024 and continues through 2025.

*American Airlines' Ongoing Discrimination*

430.    American Airlines failed to engage in meaningful interactive dialogue about potential accommodations.

431.    American Airlines failed to explore alternative positions that could accommodate Lezcano's disability.

432.    American Airlines retaliated against Lezcano for requesting accommodation and questioning discriminatory practices.

433.    American Airlines forced Lezcano to choose between his health and income by:

    a.    Eliminating his ability to self-accommodate through bidding and selecting gate assignment which doesn't require lifting heavy bags;

b.   Imposing punitive restrictions when he sought formal accommodation;

c.   Retaliating when he questioned discriminatory practices;

d.   Forcing him to reduce his hours to manage his disability.

434.   American Airlines' actions demonstrate a pattern of discriminating against and retaliating against employees with disabilities.

435.   American Airlines subjected Lezcano to unfair treatment, retaliation, and financial harm due to his disability.

436.   American Airlines' refusal to accommodate Lezcano directly violated the ADA.

## CLASS ALLEGATIONS

437.   Plaintiffs brings these class actions on behalf of herself and the similarly situated Putative Class Members pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

438.   The Rule 23(b)(2) Class ("Injunctive Class") is defined as:

**All current and former employees of American Airlines who: (1) have disabilities within the meaning of the ADA, 42 U.S.C. § 12102(1); (2) are qualified under the ADA, 42 U.S.C. 12111(8); and (3) are subject to American Airlines' illegal policies regarding reasonable accommodations.**

439.   The Rule 23(b)(3) Class ("Damage Class") is defined as:

**All current and former employees of American Airlines who: (1) have disabilities within the meaning of the ADA, 42 U.S.C. § 12102(1); (2) are qualified under the ADA, 42 U.S.C. 12111(8); and (3) have been adversely affected by American Airline's policies regarding reasonable accommodations.**

440.   Based on Plaintiffs experiences with American Airlines, Plaintiffs are aware American Airlines' illegal practices were (and continue to be) imposed on the Putative Class Members.

441.   The Members of the Putative Classes are similarly situated in all relevant respects.

442.   Even if their precise job duties and locations might vary somewhat, these differences do not matter for the purposes of determining their entitlement to protections under the ADA.

443.   Therefore, the specific job titles or precise job locations of the various members of the Putative Classes do not prevent class treatment.

444.   Rather, the Putative Classes are held together by American Airlines' uniform policy and practice of violating the ADA by refusing to engage in the interactive process with employees with disabilities, refusing to accommodate employees with disabilities, and even terminating employees with disabilities.

445.   On behalf of the Putative Class Members of the Injunctive Class, Plaintiffs ask this Court to enjoin American Airlines from violating the ADA by ignoring requests for reasonable accommodations and failing to offer reasonable accommodations, where possible.

446.   On behalf of the Putative Class Members of the Damage Class, Plaintiffs seek to recover monetary damages on behalf of those who have suffered adverse actions by American Airlines in the past.

447.   The Members of the Injunctive Class and Damage Class are both so numerous that joinder of all individual members would be impracticable. The disposition of the individual claims of the respective class members through this action will benefit both the parties and this Court.

448.   Plaintiffs' claims are typical of the claims of the Members of the Putative Classes. The claims of the Plaintiffs and the Members of the Putative Classes are based on the same legal theories and arise from the same unlawful conduct.

449.   Plaintiffs do not have any interests contrary to, or in conflict with, the Members of the Putative Classes that would prevent class treatment.

450.   Like each Putative Class Member of the Injunctive Class, Plaintiffs have an interest in permanently enjoining American Airlines ensure compliance with the ADA.

451.   Likewise, Plaintiffs have has suffered damages in the past as a result of American Airlines' violations of the ADA, and Plaintiffs interests in recovering monetary damages are aligned with the interests of the Putative Class Members of the Damage Class

452.   Class treatment of Plaintiffs' claims is superior to other available means for fair and efficient adjudication of the lawsuit.

453.   Absent a class action, many Members of the Putative Classes will not obtain redress for their injuries, and American Airlines will reap the unjust benefits of violating the ADA.

454. Further, even if some of the Members of the Putative Classes could afford individual litigation against American Airlines, it would be unduly burdensome to the judicial system.

455. Concentrating the litigation in one forum will promote judicial economy and parity among the claims of the Members of the Putative Classes, as well as provide judicial consistency.

456. A single injunction or declaratory judgment would provide relief to each member of the Injunctive Class and would prevent American Airlines from continuing its ADA violating practices.

457. Likewise, the questions of law and fact that are common to each Member of the Damage Class predominates over any questions affecting solely the individual members.

458. There are common questions of fact and law affecting Members of the Damage Class in that they have suffered compensable injury as a result of American Airlines' refusal to engage in the interactive process with employees with disabilities, refusal to accommodate employees with disabilities, and terminating employees with disabilities.

459. Class treatment for the Damage Class is superior to other methods of litigation, and Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class action.

460. Those similarly situated employees are known to American Airlines, are readily identifiable, and can be located through American Airlines' records.

461. The employees adversely affected by American Airlines' ADA violating policies and procedures make up the Putative Class Members.

462. Indeed, American Airlines has been on notice that their policies and procedures adversely affect employees with disabilities.

463. Indeed, American Airlines has been on notice that their policies and procedures adversely affect their employees protected by the ADA because of a previously filed lawsuit, alleging American Airlines required employees to have no restrictions before they could return to work following a medical leave. Under its policy, American Airlines refused engaged in the interactive process and refused to permit disabled employees requesting reasonable accommodations to return to work. *Equal Employment Opportunity Commission v. American Airlines, Inc., et al.*, No. 17CV04059 (D. Arizona 2017).

464. Specifically, in the 2017 lawsuit, the EEOC alleged: "Defendants have had a 100% return-to-work policy that requires employees to return to work without restrictions. . . . At all relevant times, Defendants have had have a policy that requires employees who are no longer able to do their job without reasonable accommodation to find other jobs, apply for other jobs, to compete for other jobs without regard to reassignment as a reasonable accommodation." *Id.* at ¶ 11–12.

465. Although American Airlines has removed its discriminatory "100% return-to-work" Policy from its handbook and employee documents, it continues to

practice and enforce the unwritten policy in practice and continues to adversely affect Plaintiffs and the Putative Class Members.

466.    Furthermore, American Airlines' policy requiring their employees with disabilities to wait for an accommodating position to open and then requiring them to compete with other employees *without* disabilities for the position also violates the ADA.

467.    American Airlines' ADA violating policies adversely affect Plaintiffs and the Putative Class Members who benefit from the protections under the ADA, including but not limited to American Airlines' refusal to engage in the interactive process with employees with disabilities, refusal to accommodate employees with disabilities, and even terminating employees with disabilities.

468.    American Airlines is a sophisticated party and employer, and therefore knew (or should have known) their policies and practices are in violation of the ADA.

469.    American Airlines maintains a rigid workplace policy and practice that forces employees to either work without restrictions or take FMLA leave if eligible.

470.    This "100% work or no work" policy means that employees are required to perform their duties without reasonable accommodations such as modified work duties or schedules, regardless of their disabilities or medical conditions.

471.    Through this policy and practice, American Airlines systematically refuses to inform employees with disabilities of their rights under the ADA and refuses to engage in the interactive process required by law.

472. American Airlines refuses to explore or discuss reasonable accommodations such as modified duties or schedules that would allow employees with disabilities to continue working.

473. American Airlines forces employees with disabilities to take time off instead of considering accommodations that would allow employees to continue to do their job.

474. American Airlines insisted that employees with disabilities take unnecessary leaves of absences.

475. Employees with disabilities who are not eligible for FMLA approved time off are discriminatorily penalized with attendance points for their disability related absences.

476. The discriminatory issuance of attendance points for disability-related absences leads to, among other harms, discriminatory termination of employment.

477. American Airlines penalizes employees with forced leaves of absence despite being able to work with reasonable accommodation, the discriminatory use of attendance points, and termination.

## VI.
## CAUSES OF ACTION

### COUNT ONE
### Pattern or Practice of Failing to Accommodate Employees
### 42 U.S.C. §§ 12112(a) and (b)(5)(A)

478. Plaintiffs bring their claims under the ADA as Rule 23 class actions.

479. The ADA prevents employers from discriminating against their disabled employees, including but not limited to "not making reasonable accommodations to

the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §§ 12112(a), (b)(5)(A).

480. At all relevant times, American Airlines was a "covered entity" and "employer" subject to the requirements of the ADA. 42 U.S.C. § 12111(2), (5).

481. At all relevant times, Plaintiffs and the Members of the Putative Classes were "employees" of American Airlines within the meaning of the ADA. 42 U.S.C. § 12111(4).

482. At all relevant times, Plaintiffs and the Members of the Putative Classes were "qualified individuals" the meaning of the ADA. 42 U.S.C. § 12111(8).

483. At all relevant times, Plaintiffs and the Putative Class Members requested "reasonable accommodations" the meaning of the ADA. 42 U.S.C. § 12111(9).

484. In violation of the ADA, American Airlines discriminatorily refused to engage in the interactive process with its disabled employees who have requested reasonable accommodations in the past, including but not limited to timely reassignment, for Plaintiffs and the Putative Class Members.

485. In violation of the ADA, American Airlines discriminatorily refused to provide reasonable accommodations, including but not limited to timely reassignment, modified duties, disability-related absence without being penalized with attendance points, for Plaintiffs and the Putative Class Members.

486. American Airlines discriminatorily penalized and terminated disabled employees who have requested reasonable accommodations, including but not limited

to modified duties, timely reassignment, and disability-related absence without being penalized with attendance points, in violation of the ADA.

487.   American Airlines' failure to engage in the interactive process and/or provide Plaintiffs and the Putative Class Members with any reasonable accommodation was intentional.

488.   American Airlines' failure to provide Plaintiffs and the Putative Class Members any reasonable accommodation was malicious and/or done with reckless indifference to their federally protected rights.

489.   The effect of the practices complained of in the foregoing paragraphs has been to deprive Plaintiffs and the Putative Class Members of equal employment opportunities and otherwise adversely affect their status as an employee, because of their disability.

## VII.
## INJUNCTIVE AND EQUITABLE RELIEF

490.   Plaintiffs and the Putative Members of the Injunctive Class are entitled to injunctive and equitable relief pursuant to law. Plaintiffs requests the court provide equitable and injunctive relief including but not limited to: injunction prohibiting American Airlines from engaging in the unlawful employment practices alleged in this complaint, in addition to other equitable relief that may prove to be available.

## VIII.
## DAMAGES

491.    As a direct and proximate result of the wrongful acts and/or omissions of American Airlines, Plaintiffs and the Putative Class Members have suffered damages, including but not limited to past:

a.    Pecuniary loss;

b.    Lost wages, salaries, and/or other benefits;

c.    Lost earning capacity;

d.    Loss of benefits;

e.    Loss of use

f.    Back pay;

g.    Interest on back pay;

h.    Out of pocket expenses;

i.    Mental anguish damages;

j.    Emotional pain and suffering;

k.    Loss of enjoyment of life and/or physical impairment;

l.    Inconvenience;

m.    Other non-pecuniary loss;

n.    Compensatory damages;

o.    Actual monetary losses;

p.    Liquidated and/or statutory damages;

q.    Pre and post judgment interest;

r.    Other interest allowed by law;

s.    Costs of court;

**t.**     Legal expenses, expert fees, and attorneys' fees pursuant to 42 U.S.C. 12117.

## IX.
## PRAYER

Plaintiffs pray that Defendant American Airlines be cited to appear and answer and that upon final hearing, Plaintiffs recover judgment against the American Airlines for the following:

a.     Grant a permanent injunction enjoining American Airlines, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from discriminating against employees or applicants because of disability;

b.     Grant a permanent injunction enjoining American Airlines, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, to engage in the interactive process with all disabled employees requesting reasonable accommodations;

c.     Grant a permanent injunction enjoining American Airlines, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from denying reasonable accommodations requested by its disabled employees;

d.     All actual and nonpecuniary damages resulting from American Airlines' acts and/or omissions;

e.     For an Order certifying the Putative Classes as defined in Paragraphs 438 and 439, and designating Plaintiffs as Representative of the Putative Classes;

f.      For an Order awarding damages to Plaintiffs and the Members of the Damage Class;

g.      For an Order awarding punitive damages to Plaintiffs and the Members of the Damage Class for the intentional acts of American Airlines;

h.      For an Order awarding the costs of this action;

i.      For an Order awarding attorneys' fees;

j.      For an Order awarding Plaintiffs service awards as permitted by law;

k.      For an Order granting such other and further relief as may be necessary and appropriate.


Date: February 14, 2025                    Respectfully submitted,


                                           /s/ Brian P. Sanford
                                           Brian P. Sanford
                                           Texas Bar No. 17630700
                                           bsanford@sanfordfirm.com
                                           Elizbeth "BB" Sanford
                                           Texas Bar No. 24100618
                                           esanford@sanfordfirm.com
                                           Yusuf Buttar
                                           Texas Bar No. 24135001
                                           ybuttar@sanfordfirm.com
                                           Karla Connell
                                           Texas Bar No. 24138108
                                           kconnell@sanfordfirm.com

**THE SANFORD FIRM**
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph: (214) 717-6653
Fax: (214) 919-0113

*Counsel for Plaintiffs and the Putative Collective Members*

**ANDERSON ALEXANDER, PLLC**

**Clif Alexander**
Texas Bar No. 24064805
clif@a2xlaw.com
**Austin W. Anderson**
Texas Bar No. 24045189
austin@a2xlaw.com
**Lauren Braddy**
Texas Bar No. 24071993
lauren@a2xlaw.com
101 N. Shoreline Blvd., Ste. 610
Corpus Christi, Texas 78401
Telephone: (361) 452-1279
Facsimile: (361) 452-1284

*Counsel for Plaintiffs and the Putative Collective Members*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document has been served via electronic filing on February 14, 2025, to counsel of record.

_/s/  Brian P. Sanford_____