**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| SANTRISE WHITE, BERCLINE MILCENT, MONIQUE SPRINGER, GIRAM SANCHEZ, DANIELLE PARIS, and JORGE LEZCANO,<br><br>Individually and on behalf of all others similarly situated,<br><br>    Plaintiff<br><br>  v.<br><br>AMERICAN AIRLINES, INC.,<br><br>    Defendant. | § § § § § § § § § § § | NO. 4:24-cv-00935-O |

**DEFENDANT AMERICAN AIRLINES, INC.'S BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF BERCLINE MILCENT**

1

TABLE OF CONTENTS

Page

SUMMARY ........................................................................................................................... 1

I.    FACTUAL BACKGROUND ....................................................................................... 3

      A.   American's Operations and ADA Policy. ......................................................... 3

      B.   Milcent's Employment with American. ............................................................ 5

           1.   Milcent Initially Worked in the Reservations Department. ..................... 5

           2.   Milcent Voluntarily Transfers to a Customer Service Agent Position. ... 5

      C.   Milcent Cannot Perform the Essential Functions of Her Position. .................. 7

      D.   Milcent Requested and Received Leave Under the FMLA and MLOA. .......... 8

           1.   American's FMLA Policy. ....................................................................... 8

           2.   American's MLOA Policy. ..................................................................... 10

           3.   Milcent's Use of FMLA and MLOA. .................................................... 11

      E.   Milcent Did Not Inform American She Had a Disability or Limitations, and She
           Never Requested an Accommodation. ............................................................ 13

      F.   Milcent's Poor Attendance Resulted in Her Termination. ............................. 13

           1.   American's Attendance Policy. .............................................................. 13

           2.   Milcent's Attendance Record and Termination. ................................... 14

II.   LEGAL STANDARD ................................................................................................ 15

III.  ARGUMENT ............................................................................................................. 16

      A.   American Is Entitled to Summary Judgment Because Milcent Did Not Request
           an Accommodation, and Her Disability, Limitations, and Need for
           Accommodation Were Not Known to American. ............................................ 16

           1.   Milcent Never Requested an Accommodation. ..................................... 16

           2.   Milcent's Disability, Limitations, and Need for Accommodation Were Not
                Obvious or Known to American. ........................................................... 18

      B.   Milcent Could Not Perform the Essential Functions of Her Position With or
           Without Reasonable Accommodation. ........................................................... 22

CONCLUSION ..................................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acker v. Gen. Motors, L.L.C.*,
  853 F.3d 784 (5th Cir. 2017) ........................................................................ 17, 19, 25

*Bright v. Martin*,
  2022 WL 16712874 (E.D. La. Nov. 5, 2022), *aff'd*, 2023 WL 4044437 (5th Cir. June 15,
  2023) ................................................................................................................ 16

*Clark v. Champion*,
  952 F.3d 570 (5th Cir. 2020) ......................................................................... 17, 24

*Credeur v. La. Through Office of Att'y Gen.*,
  860 F.3d 785 (5th Cir. 2017) ......................................................................... 22, 23

*Crossley v. CSC Applied Techs., LLC*,
  20123 WL 12099850 (N.D. Tex. July 23, 2013) ................................................. 16

*Delaval v. PTech Drilling Tubulars, L.L.C.*,
  824 F.3d 476 (5th Cir. 2016) ................................................................................ 16

*Dooley v. Parks & Recreation For Parish of E. Baton Rouge*,
  433 F. App'x 321 (5th Cir. 2011) .......................................................................... 22

*EEOC v. Chevron Phillips Chem. Co.*,
  570 F.3d 606 (5th Cir. 2009) ................................................................................ 17

*Feist v. La. Dep't. of Just., Off. of the Atty. Gen.*,
  730 F.3d 450 (5th Cir. 2013) ................................................................................ 16

*Franklin v. Union Pac. R.R. Co.*,
  2018 WL 8576557 (W.D. Tex., May 15, 2018) .................................................... 20

*Green v. Medco Health Sols. of Tex.*,
  560 F. App'x 398 (5th Cir. 2014) .......................................................................... 25

*Griffin v. United Parcel Serv., Inc.*,
  661 F.3d 216 (5th Cir. 2011) ................................................................................ 17

*Grodman v. Tex. Tech Univ. Health Sci. Ctr.*,
  816 F. Supp. 3d 602 (N.D. Tex. 2025) ................................................................. 18

*Holmes v. Silver Line Bldg. Prod. LLC*,
  2020 WL 9597788 (N.D. Ga., Aug. 5, 2020) ....................................................... 20

*Hypes on Behalf of Hypes v. First Commerce Corp.*,
  134 F.3d 721 (5th Cir. 1998) ................................................................................ 23

*Lanier v. Univ. of Tex. Sw. Med. Ctr.*,
  527 F. App'x 312 (5th Cir. 2013) .......................................................................... 22

*Mararri v. WCI Steel, Inc.*,
  130 F.3d 1180 (6th Cir. 1997) .............................................................................. 18

*Mueck v. La Grange Acquisitions, L.P.*,
   75 F. 4th 469 (5th Cir. 2023), as revised (Aug. 4, 2023)........................................................ 17

*Navarro v. Pfizer Corp.*,
   261 F.3d 90 (1st Cir. 2001) ..................................................................................................... 19

*Ormond v. CTVSEH PLLC*,
   2021 WL 4307373 (W.D. Tex. Sep. 21, 2021)........................................................................ 16

*Rogers v. Int'l Marine Terminals, Inc.*,
   87 F.3d 755 (5th Cir. 1996) ..................................................................................................... 24

*Roye v. Safety-Kleen* (*Deer Park*), *Inc.*,
   110 F. Appx. 394 (5th Cir. 2004) ............................................................................................ 20

*Samuels v. Kan. City Mo. Sch. Dist.*,
   437 F.3d 797 (8th Cir. 2006) ................................................................................................... 21

*Scott v. Garcia*,
   370 F. Supp. 2d 1056 (S.D. Cal. 2005).................................................................................... 21

*Strife v. Aldine Ind. School Dist.*,
   138 F.4th 237 (5th Cir. 2025) .................................................................................................. 19

*Taylor v. Principal Fin. Grp., Inc.*,
   93 F.3d 155 (5th Cir. 1996) ................................................................................... 17, 18, 21, 22

*Tucker v. Unitech Training Acad., Inc.*,
   783 F. App'x 397 n.2 (5th Cir. 2019) ...................................................................................... 22

*Villarreal v. Tropical Texas Behavioral Health*,
   2021 WL 3525023 (5th Cir. Aug. 10, 2021) ........................................................................... 24

*Way v. Mo. City*,
   133 F.4th 509 (5th Cir. 2025) .................................................................................................. 19

*Weber v. BNSF Ry. Co.*,
   2019 WL 9100375 (N.D. Tex. Dec. 6, 2019) .......................................................................... 23

*Willi v. Am. Airlines, Inc.*,
   288 F. Appx. 126 (5th Cir. 2008) ............................................................................................ 25

*Windham v. Harris Cnty., Tex.*,
   875 F.3d 229 (2017)............................................................................................................ 18, 21

**Statutes**

29 U.S.C. § 2611(11) .................................................................................................................... 21

42 U.S.C. § 12102(1) .................................................................................................................... 20

42 U.S.C. § 12111(8) .................................................................................................................... 23

**Regulations**

29 C.F.R. § 825.702(b) ................................................................................................................. 21

Defendant American Airlines, Inc. ("American") files this Brief in Support of its Motion for Summary Judgment and respectfully shows the following:

## SUMMARY

Plaintiff Bercline Milcent ("Milcent") is a former American employee who claims American violated the Americans with Disabilities Act, 42 U.S.C. § 12101, as amended ("ADA") by failing to provide reasonable accommodations for her digestive condition, known as "dumping syndrome." But Milcent never informed American that she has a disability or limitations, nor did she request an accommodation. That is fatal to her claim, and American is entitled to summary judgment.

The material facts are undisputed. Milcent developed dumping syndrome after weight loss surgery. Her condition causes rapid emptying of her stomach after eating, resulting in nausea, cramping, and diarrhea. Due to her symptoms, Milcent needs ready access to a bathroom and the ability to take 15-30 minute unscheduled bathroom breaks as needed. Milcent's condition also causes multi-day periods of incapacity, during which Milcent must rest, rehydrate, and regain her strength before returning to work.

To excuse her repeated absences, Milcent used sick time and was provided leave under the Family and Medical Leave Act ("FMLA") and American's Medical Leave of Absence ("MLOA") policy. When she exhausted her sick time and all available FMLA hours, Milcent began accruing points under American's attendance policy. Despite several warnings, Milcent continued accruing points for unexcused absences, and her employment was terminated pursuant to American's attendance policy. Even then, Milcent did not inform American that she needed an accommodation.

Milcent concedes she never requested an accommodation, but she blames American,

claiming (1) it did not sufficiently inform her about the ADA; and (2) it should have known about her disability, limitations, and need for accommodation because she requested FMLA leave. Both arguments fail.

Unlike some statutes, the ADA does not obligate employers to affirmatively instruct employees about their rights under the ADA; instead, it is sufficient for the employer to simply post a notice about the law's provisions in a manner that employees can access. American more than met this requirement. American posts its ADA Policy on its company intranet, JetNet, displays ADA Notices in employee break rooms and other common areas, provides information about the ADA in its job descriptions (including the one applicable to Milcent), FMLA, and MLOA policies, and in excess of its obligation, even sent letters directly to Milcent explaining the availability of reasonable accommodations and detailing how to contact American's ADA Team to request one. American made information about the ADA readily available throughout Milcent's employment, and thus, she bore the responsibility of availing herself of the information American provided. With all of these resources available to her, Milcent's ignorance about the ADA is attributable only to herself.

Milcent's claim that her FMLA requests put American on notice of a disability, limitations, and need for accommodation also fails. The law is clear: a request for FMLA leave is not a request for ADA accommodation. The FMLA and ADA have different purposes, eligibility criteria, and provide differing benefits to employees. That Milcent was granted FMLA leave does not put American on notice that her medical condition qualified as a disability under the ADA, or that she had limitations and needed and wanted an accommodation.

Even assuming Milcent's disability, limitations, and need for accommodation were somehow known to American (they were not), Milcent's failure to accommodate claim still fails

because she could not perform the essential functions of her Customer Service Agent position with or without reasonable accommodation. The nature of the airline industry generally, and the Customer Service Agent role in particular, requires employees to have regular and reliable attendance, punctuality, and the ability to perform essential job functions as assigned, in a timely manner. Milcent's unreliable attendance and need for unpredictable breaks did not allow her to perform the essential functions of her position—which included handling arrival and departure procedures for flights at one of American's busiest airports—and no reasonable accommodation could have changed that fact. Accordingly, Milcent was not a qualified individual for purposes of the ADA and summary judgment should be granted in American's favor.

## I.   FACTUAL BACKGROUND

### A.   American's Operations and ADA Policy.

American is a commercial airline providing service to destinations throughout the United States and abroad, with operations at airports worldwide. App. 002 ¶ 3. American is an equal employment opportunity employer that prohibits all forms of unlawful discrimination and harassment in the workplace. *Id.* American also provides reasonable accommodations to qualified individuals with a disability pursuant to the ADA. *Id.*

American employs designated teams to assess and respond to employee requests for reasonable accommodations and leaves of absence. App. 003 ¶ 7. The Team Member Services Center acts as a call center and takes employee calls on a variety of subjects, including disability accommodation requests, and directs each call to the correct team based on the nature of the employee's request. *Id.* The Absence and Return Center ("ARC") administers leave of absence requests, including FMLA, and the Accommodation Team ("ADA Team") handles requests for accommodation under the ADA. *Id.*

American informs employees of their ADA rights and the reasonable accommodation

process in several ways.  It posts an ADA Notice on bulletin boards in employee break rooms in

every US airport at which American operates.  App. 004 ¶ 8.  American also maintains a written

ADA Policy that details employees' ADA rights and how to request an accommodation,

explaining:

> The ADA requires covered employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or team member, absent an undue hardship on the operation of the business.  American's ADA team has created an automated intake process.  If you would like to request an accommodation, you should complete the Reasonable Accommodation and Exemption Request form online.  Once submitted, the ADA team will review and continue the interactive process.

App. 013.  American's ADA Policy is available to all employees on American's intranet portal,

JetNet.  App. 305 at 216:5-9.  JetNet also includes a "Request for Accommodation" form on which

employees can submit an accommodation request, and which outlines the steps in the

accommodation process.  App. 004 ¶ 8.  When a Request for Accommodation form is submitted,

it is routed to the ADA Team, which initiates the interactive process with the employee.  *Id.*

American employees can and do request any number of modifications to their job and

duties (e.g., reduced schedule or light duty) for any number of reasons (e.g., injury on duty or

illness).  App. 003 ¶ 7.  In response to each accommodation request, the ADA Team analyzes the

essential functions of the employee's position, the employee's medical condition, limitations and

restrictions, the requested accommodation, and whether the accommodation is reasonable or would

impose an undue hardship on American.  App. 004-005 ¶ 10.  Sometimes the requested

accommodation is granted.  App. 005 ¶ 10.  Sometimes it cannot be granted, so the ADA Team

will work with the employee to identify alternative accommodations.  *Id.*

**B.      Milcent's Employment with American.**

1.      <u>Milcent Initially Worked in the Reservations Department</u>.

American hired Milcent on January 11, 2016, as a Customer Sales Representative in the Reservations Department to assist customers with booking flights.  App. 100-101 at 11:7-12:18; App. 103-104 at 14:4-15:23.  Approximately one year later, Milcent became a Special Assistance Coordinator in the Reservations Department, which involved taking phone calls from customers seeking special assistance at the airport, e.g., wheelchair or service animal assistance.  App. 101-102 at 12:13-13:16.   In both Reservation positions, Milcent performed clerical desk work, primarily taking phone calls from an office near the Dallas-Fort Worth airport ("DFW").  *Id.*

2.      <u>Milcent Voluntarily Transfers to a Customer Service Agent Position</u>.

Reservation Representatives, as well as airport Customer Service Agents (among others), are represented by the Association of the Communications Workers of America – International Brotherhood of Teamsters (CWA-IBT) and covered by the Collective Bargaining Agreement for Passenger Service Employees.  App. 005 ¶ 11.  The CBA governs many terms and conditions of employment, including transfers to other covered positions, employee seniority, and bidding for schedules, assignments, and days off.  *Id.*

In 2022, Milcent voluntarily transferred to a Customer Service Agent position at DFW, which she bid for and was awarded based on seniority.  App. 102-103 at 13:22-14:3.  Customer Service Agents are responsible for covering the ticket counter or arrival and departure procedures at the gates, among other things.  App. 104-106 at 15:24-17:24.  As a unionized employee, Milcent bid for her position at either the ticket counter or the gates based on seniority.  App. 105 at 16:9-14.  When Milcent bid to work at the gates, she was given arrival and departure assignments, as well as miscellaneous related tasks.  App. 174-175 at 85:8-86:5; App. 185-188 at 96:7-99:2.  For arrival assignments, Milcent had deplaning duties, such as meeting the aircraft and positioning the

jet bridge for arriving passengers.  App. 187-188 at 98:21-99:2; App. 195 at 106:10-25.  For departure assignments, Milcent's duties would vary from assigning seats, confirming bag counts, scanning boarding passes, and putting luggage down the bag chute.  App. 185-186 at 96:7-97:15.  When Milcent was given an arrival assignment, she was nearly always assigned "a turn" of flights—i.e., an arriving flight and a subsequent departing flight—which involved both arrival and departure duties.  App. 188 at 99:4-9; App. 211 at 122:11-18.  In addition to arrival and departure assignments, Milcent was also assigned standalone tasks, like moving a jet bridge into a storage position.  App. 206 at 117:3-7.

The duration of departure and arrival assignments varies based on several factors, such as aircraft size and the number of special assistance requests.  App. 190-194 at 101:19-105:11.  On average, an arrival assignment takes between 20 minutes and an hour.  App. 190-192 at 101:19-103:16.  Customer Service Agents must be at their assigned gate approximately 10-15 minutes before the projected arrival time in case the flight comes early.  App. 194-195 at 105:25-106:9.  Departure assignments take one-to-two hours, and moving a jet bridge into a storage position takes 20 minutes or more.  App. 192-194 at 103:21-105:11; App. 198 at 109:2-7; App. 205 at 116:7-9.

American sends assignments to Customer Service Agents on "Rover," which is an electronic platform that allows American to assign arrival or departure duties in real time.  App. 189 at 100:22-25.  On some occasions, Milcent would receive a new task on Rover right before or right after she completed a task, without a gap in between.  *Id.*  Other times, a delay between tasks provided downtime, or Milcent could be assigned a break or meal period.  App. 202-203 at 113:9-12; 114:15-21.

Covering departure and arrival assignments involves several essential functions of the Customer Service Agent position, including:

1. having "regular and predictable attendance on site, including satisfying mandatory overtime requirements";
2. performing "passenger check-in and passenger seat assignment";
3. performing "passenger boarding, including ticket lift and/or boarding pass lift/verification";
4. operating "gate reader/scanner and associated duties to include pre-boarding, monitoring/checking carryon baggage and exit row criteria";
5. maintaining "timeline of flight boarding process";
6. "accept[ing], check[ing] and tagg[ing] passengers' baggage at resolution centers, full-service ticket counters, and first class ticket counters"; and
7. "queue[ing] lines at ticket counter kiosks and ticket counters."

App. 080-081.  The Customer Service Agent job description further states:

> \* Reasonable accommodations may be made for qualifying individuals with disabilities.

*Id*.

## C.    Milcent Cannot Perform the Essential Functions of Her Position.

Following weight loss surgery in 2017, and while working as a Customer Sales Representative in the Reservations Department, Milcent developed dumping syndrome.  App. 123 at 34:1-3; App. 128 at 39:8-10; App. 158 at 69:1-2.  As Milcent described, after consuming any food, she becomes nauseous and experiences cramping and diarrhea, requiring her to urgently use the bathroom at least once, and "sometimes it would be back to back, even after just one meal." App. 126 at 37:14-24; App. 133-134 at 44:15-45:14.  Each bathroom visit takes an average of 15 minutes, and Milcent needs 15-30 minute breaks for each bathroom "session."  App. 134 at 45:3-14; App. 178-179 at 89:21-90:1.  Due to her condition, Milcent often experiences dehydration, dizziness and weakness, which requires her to rehydrate and rest to regain her strength.  App. 246-247 at 157:23-158:9.  Approximately every other week, Milcent needs "two or three days" off work to rest and recuperate.  App. 245 at 156:2-7; App. 252-253 at 163:20-164:25.

When Milcent was in the Reservations Department, she had ready access to the restroom and was able to perform the essential functions of her role.  App. 136-137 at 47:19-48:19.  Once

she voluntarily bid for and transferred to the Customer Service Agent role in 2022, however, Milcent struggled with her attendance and the time-sensitive nature of her duties. App. 170 at 81:11-13; App. 173-174 at 84:16-85:8. It was particularly challenging when Milcent worked the gates, for which she repeatedly bid as her preference. *See* App. 170 at 81:11-13; App. 173-174 at 84:16-85:8. Milcent recalls three instances in which she abandoned her gate assignment to use the restroom, despite being directed by the staffing department on two of those occasions to complete her arrival/departure duties before leaving her assignment. App. 177 at 88:14-22; App. 211-214 at 122:24-123:17; 124:15-125:7; App. 219-222 at 130:7-11; 131:12-133:17. Milcent did not inform the staffing department that a medical condition caused her to urgently need a break, but instead said, "Hey, I have to use the bathroom." App. 220 at 131:7-18.

**D.      Milcent Requested and Received Leave Under the FMLA and MLOA.**

      1.      <u>American's FMLA Policy</u>.

American's FMLA Policy provides "notice to team members of their rights and responsibilities under the [FMLA] and outlines the process by which team members can apply for authorized leave under FMLA." App. 034. Pursuant to the FMLA, "eligible[1] team members . . . are entitled to up to a total of 12 work weeks of leave in a 12-month rolling backward period . . . for a qualifying reason." *Id.* FMLA leave may be taken, among other reasons, because of a "serious health condition that makes a team member unable to perform the functions of a team member's job." App. 035. A "serious health condition" is defined by the FMLA as an "illness, injury, impairment or physical or mental condition that involves a period of incapacity or treatment connected with" inpatient care, incapacity and continuing treatment, pregnancy or prenatal care,

---

[1] To be eligible for FMLA, a employee must be a "regular or temporary full or part-time member of the Company who works in the United States;" have "been employed by the Company for at least 12 months on the date on which any FMLA leave is to begin"; and have "worked a minimum of 1,250 hours during the 12-month period immediately preceding the commencement of leave." App. 034.

chronic conditions, permanent or long-term conditions, or conditions requiring multiple treatments. *Id.* For chronic conditions, FMLA leave may be used on an intermittent basis for "any period of incapacity or treatment for such incapacity due to a chronic serious health condition." *Id.*

Assuming the team member is eligible for FMLA, when a team member seeks FMLA leave for their own "serious health condition," they "must submit medical certifications supporting their need for FMLA-qualifying leave," including a "Health Care Provider Certification Form . . . supporting the need for FMLA leave within fifteen calendar days of the date requested by ARC, unless it is not practicable to do so despite a team member's diligent good faith efforts." App. 039. It is the "team member's responsibility to ensure that the completed medical documentation is received by the Company within the administrative deadlines." App. 039-040. When "adequate certification is not received timely, the FMLA request may be delayed or, where appropriate, denied." App. 039. The FMLA Policy explicitly states, "if the absence for which FMLA is being requested has already occurred and a complete and sufficient certification or medical documentation is not provided in a timely manner, the FMLA request may be denied and a team member may be subject to appropriate discipline for attendance." *Id.* The FMLA Policy also provides the following regarding the ADA:

### Coordination of FMLA with other company leaves

Team members may qualify for other types of leave including state or local leaves or leave as a reasonable accommodation under the Americans with Disabilities Act (ADA). Team members should consult their People Business Partner or leave administrator with any questions regarding state or local leaves, or leave under the ADA.

…

- If you are released to return to work with restrictions. In such circumstances, you may still qualify to return to work with an ADA accommodation. Please see the ADA Policy for further information.

- If you are unable to or you are unsure if you are able to perform the essential functions of your job. In such circumstances, you may still qualify for an ADA accommodation. Please see the ADA Policy for further information.

App. 042.

    2.    <u>American's MLOA Policy</u>.

American also maintains a Medical Leave of Absence ("MLOA") policy that enables team members to take time away from work for medical reasons in a consecutive/block period of time, for up to a maximum of one year of leave.[2] App. 073. Under the MLOA policy, "team members who are unable to work due to their own serious health condition, may request leave . . . for a consecutive or block of time." *Id.* If "FMLA is denied due to eligibility but a complete and sufficient health care provider form is received, [a team member's] request will be processed as MLOA." *Id.* As with FMLA, team members are required to submit their health care provider certification within fifteen calendar days of the requested leave start date. App. 074. If a team member fails to submit adequate certification in a timely manner, "the MLOA request may be delayed or, where appropriate, denied." App. 075. Where a request is made for an absence that has already occurred, and a team member fails to timely submit documentation, "the MLOA request may be denied and a team member may be subject to appropriate discipline for attendance." *Id.* The MLOA Policy also provides the following regarding the ADA:

---

[2] For members of the CWA-IBT, such as Milcent, a MLOA may last up to a maximum of 5 years.

If the Company determines that additional job-protection should be provided as an ADA reasonable accommodation, the Company will return the team member to his/her original position unless doing so poses an undue hardship on the Company's business operations. The Company will decide whether the leave is reasonable and/or poses an undue hardship on a case-by-case basis.

…

- If you are released to return to work with restrictions. In such circumstances, you may still qualify to return to work with an ADA accommodation. Please see the ADA Policy for further information.

  If you are unable to or unsure if you are able to perform the essential functions of your job. In such circumstances, you may still qualify for an ADA accommodation. Please see the ADA Policy for further information.

App. 077.

3.      Milcent's Use of FMLA and MLOA.

Milcent requested, was approved for, and received intermittent leave under FMLA several times during her employment. Each time Milcent applied for FMLA leave, she submitted her request to ARC and received a letter detailing her FMLA rights and eligibilities. App. 033. The letter informed Milcent, among other things, when she needed to submit a supporting health care certification and that "if sufficient information [was] not provided in a timely manner, [her] leave may be delayed or denied." App. 510 (emphasis omitted). After submitting FMLA documentation, Milcent received a leave determination via letter and email, indicating that her leave was approved or denied. *See, e.g.*, App. 491, 497, 502. On at least three occasions, American sent letters directly to Milcent with the following provision:

**Reasonable Accommodations**

American Airlines is committed to providing reasonable accommodations to help otherwise qualified employees with a disability perform their essential job functions. If you feel you are an individual that has a physical or mental impairment that substantially limits one or more major life activities who could perform the essential functions of your job with or without a reasonable accommodation, you may be eligible for a reasonable accommodation as defined under the Americans with Disabilities Act (ADA).

If you feel you have a disability and need a reasonable accommodation, please complete the Reasonable Accommodation form found on Jetnet and email to the ADA team at ADA.Team@aa.com. If you have any questions about the ADA accommodation process please reach out to your supervisor, leader to People Business Partner.

*Id.* Milcent testified that she read each of these letters. App. 260 at 171:3-7.

In total, Milcent received intermittent FMLA leave at least six times, covering over four years in the approximately six-and-a-half-year period between February 2018 and June 2024. App. 512, 515, 518, 521, 524, 527. While Milcent was approved for intermittent FMLA leave during each of these periods (and for the specified durations), she was advised that the FMLA would not protect her absences if she had exhausted her annual FMLA allotment of 12 weeks per rolling calendar year. App. 513. Milcent was able to track her FMLA hours allotment on American's Timekeeping System and received courtesy emails from American notifying her when an intermittent leave time period was set to expire. App. 550, 552, 554, 556.

American approved a number of Milcent's FMLA requests because her absence fell within the scope of the policy, Milcent timely submitted supporting documentation, and she had available FMLA leave hours. In some cases, however, American denied her FMLA leave requests because those conditions were not met. *See, e.g.*, App. 033. In particular, on several occasions, Milcent failed to provide adequate supporting documentation by the due date, resulting in a denial of her leave request. *E.g.*, App. 531. On the other hand, when Milcent submitted the necessary

supporting documentation but had exhausted her FMLA leave hours, American approved her requests for leave under MLOA when eligible under that policy.  App. 534.

**E.      Milcent Did Not Inform American She Had a Disability or Limitations, and She Never Requested an Accommodation.**

Milcent did not submit a Reasonable Accommodation form, contact the American ADA team, or ask for an accommodation.  App. 293-294 at 204:16-205:3; App. 301-302 at 212:9-13; 213:3-12 (Q. "You never requested an exception to the attendance policy during your employment, correct? A. Correct.").  Milcent never told her Customer Service Managers or ARC that she had a disability.  App. 393 at 304:2-10 ("Q. Okay. But you never told any of [your managers], 'I have dumping syndrome and' – A. No. Q. –'have these medical issues'? A. No. Q. Okay. Did you ever talk to anyone in ARC, Absence & Return Center? A. No, not outside of what was indicated on my paperwork.").  Likewise, she did not inform the staffing department that she had dumping syndrome when she requested unscheduled breaks.  App. 220 at 131:2-8.  And Milcent concedes that her digestive condition is not visually obvious.  App. 318 at 229:11-17.

**F.      Milcent's Poor Attendance Resulted in Her Termination.**

1.      <u>American's Attendance Policy</u>.

American's attendance policies vary based on workgroup.  App. 13 ¶ 13  As a Customer Service Agent, Milcent was subject to American's "Attendance Guidelines For Passenger Service Group Covered By CWA/IBT Agreement" ("Attendance Policy").  App. 558.  Per the Attendance Policy, "[t]eam members are expected to report to work regularly and on time and remain in their assigned work area as necessary for the efficient performance of their work."  App. 560.  The policy further notes that "[w]hen documentation is required, i.e., FMLA, it is the team member's responsibility to ensure their health care provider submits the required paperwork to and has been received by the company."  *Id.*

The Attendance Policy sets forth a procedure under which American tracks attendance occurrences, essentially on a rolling 12-month basis:

> The company will track chargeable attendance occurrences and their cumulative total over the previous twelve (12) month period of active service starting from the first day of absence associated with the most recent attendance occurrence to determine if a progressive level review is warranted. Once a level has been issued [(e.g., Coaching, Level 1, Level 2, or Level 3)], attendance is reviewed during the effective period of review level, which is 12 months of active service starting on the date a level is issued to the team member.

App. 563.   When Customer Service Agents miss work, they are assessed points under the Attendance Policy, unless the absence is protected by state or federal law, e.g., FMLA. *Id.*   The point assessment depends on the type of absence occurrence and ranges from .5 to 2.5 points.  App. 567   Under the policy, "authorized leaves are not counted as points and are not subject to progressive review levels *when acceptable documentation is submitted to the company*."  App. 563 (emphasis added).

     2.     <u>Milcent's Attendance Record and Termination</u>.

Milcent received multiple progressive level reviews due to excessive unexcused absenteeism under the Attendance Policy, which she accrued when she failed to submit required supporting documentation for her FMLA requests or was absent after exceeding available FMLA hours.  She received a "Coaching – Attendance" warning on February 15, 2022; a "Level 1" warning on August 1, 2022; a "Level 2" warning on October 12, 2022; and a "Level 3" warning on October 25, 2022.  App. 538-539.  During this time, American sometimes issued attendance points and later removed them after Milcent provided documentation for approved leave that covered the implicated time period (even after the initial deadline to do so).  *Id.*

On January 24, 2023, Milcent participated in a termination conference with Kaylin Artola, a Customer Service Manager, during which they reviewed the 2.50 attendance points Milcent

received after American issued the Level 3 for Attendance, which qualified her for termination under the Attendance Policy.  App. 538.  Milcent and Artola discussed Milcent's pending FMLA leave request, which sought to cover the additional 2.5 attendance points.  *Id.*  Though American had not yet received the required supporting documentation for her request, Milcent advised that her doctor had faxed over the documentation.  *Id.*  Artola decided to reduce some of Milcent's attendance points as a courtesy because Milcent claimed she was not aware how FMLA hours worked.  *Id.*

Between February 2023 and June 2023, Milcent submitted several requests to ARC for FMLA or MLOA leave.  American approved nearly all of these requests under FMLA, or when hours were exhausted, MLOA, despite Milcent's failure to timely submit supporting certifications.  App. 545.  On August 3, 2023, after Milcent accrued two more points for absences that exceeded her approved and protected time away, American terminated Milcent's employment for violation of the Attendance Policy.  App. 537; FAC ¶ 140.[3]

## II.    LEGAL STANDARD

"Summary judgment is proper  'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'  A genuine dispute of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant; that is, '[a]n issue is material if its resolution could affect the outcome of the action.'  When reviewing a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party.  In doing so, the court 'refrain[s] from making

---

[3] Milcent testified that three points she incurred were originally coded under FMLA (and thus excused) but then recorded as unexcused absences after her termination.  App. 336-339 at 247:20-250-9.  But the only evidence she offers to support that assertion is that these dates were not discussed in the termination meeting with Artola in July 2023.  App. 345 at 256:4-257:3.  In reality, these points correspond to absences for which (1) Milcent's request for leave had been denied for failure to timely submit supporting documentation; or (2) American has no record of Milcent submitting a leave request.  App. 547, 057.

credibility determinations or weighing the evidence.'" *Crossley v. CSC Applied Techs., LLC*, 20123 WL 12099850, at \*2 (N.D. Tex. July 23, 2013) (alterations in original) (citations omitted).

## III.    ARGUMENT

Milcent brings a single claim against American for failure to accommodate in violation of the ADA.[4]  "Under the ADA, an employer must make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Ormond v. CTVSEH PLLC*, 2021 WL 4307373, at \*10 (W.D. Tex. Sep. 21, 2021) (quoting *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016)).  To prevail on a failure-to-accommodate claim, Milcent must prove she is "(1) . . . a qualified individual with a disability; (2) the disability and its consequential limitations were known by [American]; and (3) [American] failed to make reasonable accommodations for such known limitations." *Feist v. La. Dep't. of Just., Off. of the Att'y. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (quotations omitted).  The undisputed facts show (1) Milcent never requested a reasonable accommodation; (2) American did not know Milcent was disabled, had limitations, or needed accommodation; and (3) Milcent could not perform the essential functions of her position with or without a reasonable accommodation.

**A.    American Is Entitled to Summary Judgment Because Milcent Did Not Request an Accommodation, and Her Disability, Limitations, and Need for Accommodation Were Not Known to American.**

1.    Milcent Never Requested an Accommodation.

"Failure to request an accommodation, particularly where an employee's disability is not obvious, will doom a claim." *Mueck v. La Grange Acquisitions, L.P.*, 75 F. 4th 469, 485 (5th Cir.

---

[4] To support her single claim, Milcent alleges that her termination from American was discriminatory.  FAC ¶¶ 150, 153, 155-56, 486.  But, under established precedent, neither an adverse employment action, nor the motivation behind any alleged failure to accommodate are elements of a failure-to-accommodate claim. *See Bright v. Martin*, 2022 WL 16712874, at \*3-4, \*6 (E.D. La. Nov. 5, 2022)  (holding a "justification for the [plaintiff's] termination is immaterial to the ADA failure to accommodate claim" and that the "termination itself is only material to the ADA failure to accommodate claim insofar as it constitutes a firm and unequivocal denial of the request to leave before relief arrived (assuming that such a request was even made)"), *aff'd*, 2023 WL 4044437 (5th Cir. 2023).

2023), *as revised* (Aug. 4, 2023). "Employees who require accommodation due to a disability are responsible for requesting a reasonable accommodation." *Acker v. Gen. Motors, L.L.C.* 853 F.3d 784, 791 (5th Cir. 2017) (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216 (5th Cir. 2011)); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) ("[A]n employee who needs an accommodation because of a disability has the responsibility of informing their employer."). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

In *Clark v. Champion National Security, Inc.*, the Fifth Circuit found that the plaintiff's failure to request an accommodation foreclosed his failure-to-accommodate claim. 952 F.3d 570, 587 (5th Cir. 2020). There, the plaintiff suffered from diabetes, which caused him to lose consciousness and fall asleep at his desk. *Id.* at 576-78. Despite requesting and receiving accommodations for other diabetes-related symptoms, the plaintiff never requested an accommodation for loss of consciousness and was subsequently terminated for sleeping at his desk. *Id.* at 584. In affirming the District Court's decision, the Fifth Circuit explained that "it is the plaintiff's burden to request reasonable accommodations" and because he failed to do so, his failure-to-accommodate claim failed. *Id.* So too here. It is undisputed that Milcent never requested an accommodation. App. 301-302 at 212:9-213:5 ("Q. … So did you ever fill out a reasonable accommodation form on Jetnet? A. …no."); App. 286 at 197:20-24; App. 293-294 at 204:24-205:3 ("Q. You never requested an exception to the attendance policy during your employment, correct? A. Correct."). Her failure to do so is fatal to her claim. *Mueck*, 75 F.4th at 485; *see also Taylor*, 93 F.3d at 165.

Milcent claims American is to blame for her failure to request an accommodation because

it did not sufficiently educate her about reasonable accommodations and the ADA.  App. 293 at 204:22-23 ("I've never requested an exception because I didn't know I had to.").  Her argument is fundamentally flawed.

Initially, "nothing within the ADA requires an employer to provide notice of an employee's rights under the statute."  *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir. 1997).  But even if American were obligated to affirmatively educate Milcent on the ADA, it did so in numerous ways, including in (1) the Customer Service Agent job description (App. 079); (2) three letters sent directly to Milcent explaining the process for requesting a reasonable accommodation and how to contact the ADA team (App. 491, 497, 502); (3) its ADA Policy (App. 507); (4) its FMLA Policy (App. 033; 299-302); (5) its MLOA Policy (App. 072); and (6) ADA Notices posted in American's airport breakrooms (App. 004 ¶ 8).  Milcent's failure to review and act on the information American provided to her does not somehow impose liability on American.

2.   Milcent's Disability, Limitations, and Need for Accommodation Were Not Obvious or Known to American.

"Having failed to timely request a reasonable accommodation, [Milcent] can prevail [on her failure to accommodate claim] only if [s]he satisfies the 'open, obvious, and apparent' exception."  *Grodman v. Tex. Tech Univ. Health Sci. Ctr.,* 816 F. Supp. 3d 602, 621 (N.D. Tex. 2025).  This "narrow exception" to an employee's obligation to request an accommodation is "limited to those situations where the employer clearly would have known of the employee's 'disabilities, limitations, and necessary accommodations' absent any notification from the employee."  *Id.*  (quoting *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 239 (2017)).  To meet the exception, Milcent "must adduce evidence that all three were or should have been obvious." *Windham*, 875 F.3d at 238 (*quoting Taylor*, 93 F.3d at 165).

-18-

Milcent concedes her dumping syndrome is not obvious and she did not speak with American about it.  App. 319 at 230:18-21 ("Q. …as you mentioned, not all disabilities are visible, right?  A. Correct. Q. …without knowing your history, I wouldn't know what is going on in your medical history, correct? A. Correct."); App. 391-393 at 302:19-304:14 ("Q.  Okay.  Did you talk to them about what your medical condition was?  No. . . . Q. . . . And your manager that you worked with in the operation, customer service managers, did you ever tell any of them about your medical condition?  A.  No . . .   Q. . . . you never told any of them, 'I have dumping syndrome and have these medical issues?  A.  No . . .   Q. . . . . Did you ever talk to anyone in ARC, Absence & Return Center?  A. … No.").

Milcent contends that, despite never telling American she has a disability, American should have known she is disabled, has limitations, and needed an accommodation because she took FMLA leave and submitted associated paperwork.  App. 390-391 at 301:21-302:12.  Her argument fails for three reasons.

First, "a request for FMLA leave is not a request for a reasonable accommodation under the ADA."  *Acker*, 853 F.3d at 791.  "The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief."  *Id.* (*quoting Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir. 2001)).  As the Fifth Circuit explained in *Acker*, "an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the  job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job."  *Id.* at 791-92 (emphasis in original); *see also Way v. City of Mo. City*, 133 F.4th 509 (5th Cir. 2025) (following *Acker*); *Strife v. Aldine Ind. School Dist.*, 138 F.4th 237, 245-46 (5th Cir. 2025) ("The submission of a request for accommodation triggers the employer's obligation to participate in an

-19-

interactive process to identify an appropriate accommodation.") (alternation omitted) (quotation omitted).

Second, the fact that Milcent's dumping syndrome constituted a "serious health condition" within the meaning of the FMLA does not mean she has a "disability" within the meaning of the ADA. *See Franklin v. Union Pac. R.R. Co.*, 2018 WL 8576557, at *4 n.4 (W.D. Tex., May 15, 2018) ("[A] 'disability' is not synonymous with a 'serious health condition,' the standard on which FMLA leave eligibility is based."); *see also Holmes v. Silver Line Bldg. Prods. LLC*, 2020 WL 9597788, at *4 (N.D. Ga., Aug. 5, 2020) ("The mere fact that Plaintiff had a 'serious health condition' within the meaning of the FMLA, as discussed above, does not automatically mean she had a 'disability' within the meaning of the ADA.").

A "disability" under the ADA is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A "serious health condition" under the FMLA, however, is any "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). As the Federal Regulations state, the "ADA's 'disability' and FMLA's 'serious health condition' are different concepts, and must be analyzed separately." 29 C.F.R. § 825.702(b).

Milcent's FMLA certification indicated she has "dumping syndrome." App. 489. But dumping syndrome may or may not constitute a disability under the ADA—it depends entirely on the impact to the individual. *See, e.g., Roye v. Safety-Kleen (Deer Park), Inc.*, 110 F. Appx. 394 at *1 (5th Cir. 2004) (affirming summary judgment for employer on ADA claim when plaintiff "failed to show that his D[umping] S[yndrome] substantially limited one or more major life

activities"); *Scott v. Garcia* 370 F. Supp. 2d 1056, 1074 (S.D. Cal. 2005) (dumping syndrome constituted a disability under the ADA when it resulted in serious dietary restrictions that substantially limited a major life activity); *see also Samuels v. Kan. City Mo. Sch. Dist.*, 437 F.3d 797, 801 (8th Cir. 2006) (noting a "medical diagnosis of an impairment" alone is "insufficient" to establish a disability under the ADA). Accordingly, Milcent's FMLA request and certification could not put American on notice of a disability.

Third, even if American should have known Milcent has a disability, she must also "adduce evidence" that her limitations and need for reasonable accommodation were obvious. *Windham*, 875 F.3d at 238 (*quoting Taylor*, 93 F.3d at 165). "The distinction is critical: federal law 'requires employers to reasonably accommodate limitations, not disabilities.'" *Grodman*, 816 F. Supp. 3d at 621 (*quoting Taylor v. Principal Fin. Grp., Inc.* 93 F.3d 155, 164 (5th Cir. 1996)) (explaining the ADA requires employers "to make reasonable accommodations only to the physical or mental *limitations* resulting from the disability that is known to the employer" (emphasis in original)); *see also Taylor*, 93 F.3d at 164 ("[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability."). Milcent's limitations were not obvious to American, nor was her need for accommodation. *See* App. 391-393 at 302:19-304:16. Milcent's FMLA certification stated that she needed intermittent leave for episodes of incapacity twice per month, for 2-3 day periods. App. 490. She never informed American that anything else was needed to accommodate a disability—even as she was being terminated for excessive absences. Milcent likewise did not tell American she needed access to the bathroom for a disability, instead just saying, "Hey, I have to use the bathroom." App. 220 at 131:7-18. Because Milcent's disability, limitations, and need for accommodation were not known or obvious, she does not meet the

exception to requesting a reasonable accommodation, and her ADA claim fails as a matter of law. *See, e.g.*, *Dooley v. Parks & Recreation For Parish of E. Baton Rouge*, 433 F. App'x 321 (5th Cir. 2011) (affirming plaintiff failed to establish a prima facie case of disability discrimination under the ADA because the plaintiff admitted that he "never told [his employer] directly of my disability") (quotation omitted); *Taylor*, 93 F.3d at 164 (finding plaintiff failed to adduce enough evidence where he told his employer he was diagnosed with bipolar disorder, but he failed to indicate any impairment); *Tucker v. Unitech Training Acad., Inc.*, 783 F. App'x 397, 400 n.2 (5th Cir. 2019) (finding the plaintiff's complaint of discomfort was insufficient to place the employer on notice that the plaintiff needed a reasonable accommodation); *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 315 (5th Cir. 2013) (holding a plaintiff's complaints of sleepiness and requests to change the duration of call rotations did not make the plaintiff's insomnia known to his employer).

**B.    Milcent Could Not Perform the Essential Functions of Her Position With or Without Reasonable Accommodation.**

Even if American were somehow on notice of Milcent's disability, limitations, and need for accommodation (it was not), her claim still fails because no reasonable accommodation would have allowed her to perform the essential functions of her position. The ADA applies only to a "qualified individual" with a disability. In order to be a "qualified individual," Milcent must establish that she could perform the essential functions of her position, with or without a reasonable accommodation. *See* 42 U.S.C. § 12111(8); *Credeur v. La. Through Office of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017). She cannot do so.

Running an on-time operation to the maximum extent possible is essential in the airline industry. App. 007 ¶ 18. Airlines like American are ranked on the timeliness of their flight schedule, which can be significantly impacted by employee delays and absences. *Id.* Accordingly,

-22-

as the job description details, essential job functions of Customer Service Agents include "having regular and predictable attendance on site" and "adhering to company policies, procedures, and performance standards"—including American's attendance policy.    App. 080-081.    These essential functions are not unique to the Customer Service Agent role.    Courts have repeatedly recognized that "regular work-site attendance is an essential function of most jobs." *See Credeur v. La. Through Office of Att'y Gen.*, 860 F.3d 785, 793 (5th Cir. 2017); *Hypes on Behalf of Hypes v. First Com. Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (same); *Weber v. BNSF Ry. Co.*, 2019 WL 9100375, at *4-5 (N.D. Tex. Dec. 6, 2019) (same), *aff'd* 989 F.3d 320 (5th Cir. 2021).

Milcent was unable to perform these essential functions.    Throughout her time as a Customer Service Agent, Milcent was absent from work in excess of her FMLA intermittent leave, sick days, and the MLOA policy.    *See supra* Section. I.G.2.    She also requires 15-30 minute restroom breaks three or four times per day, which are often unpredictable and must be taken immediately when needed.    App. 214 at 125:4-8.    On two separate occasions when American needed Milcent to finish her assignment before taking a break, Milcent abandoned her position because she was unable to complete her duties before using the restroom.    *Id.* ("Q.  Did you walk over to the gate or you just went to the restroom?  A.  I went to the restroom because I couldn't hold it.").    In addition to needing "15 or 30 minute" breaks, Milcent would also need an exception from the Attendance Policy so she could take days off when needed for purposes of "maintaining [her] medical condition."    App. 315 at 226:12-23.    Milcent's periods of incapacity are also unpredictable and "would vary" based on when she became weak and felt "like the room is spinning," which could occur at any time, including "in the middle of the day."    App. 247 at 158:10-24.

As a matter of law, allowing unpredictable 15-30 minute breaks multiple times per day and

unpredictable multi-day absences are not reasonable accommodations, certainly not for an agent at the airport working active flights. Not only could those breaks and absences significantly impact the operation by causing flight delays and disruptions, they would not allow Milcent to perform the essential functions of her role, which include regular and predictable attendance on site. Fifth Circuit precedent is instructive. In *Villarreal v. Tropical Texas Behavioral Health*, the plaintiff regularly missed work to care for her special needs child, and then to recuperate from surgery and care for herself in the wake of a clinical depression diagnosis. 2021 WL 3525023, *2 (5th Cir. Aug. 10, 2021). The plaintiff requested FMLA leave to excuse these absences, which her employer approved. *Id.* She later requested a decrease in her total number of work hours as an accommodation. *Id.* at *2-3. When her FMLA leave was exhausted, she continued to accrue several unexcused absences which, in conjunction with her refusal to accept alternate accommodations, resulted in her termination. *Id.* at *3. The Fifth Circuit affirmed the denial of the plaintiff's summary judgment motion on her failure-to-accommodate claim, finding "the inability . . . to attend work disqualifies one from being a 'qualified individual with a disability' . . . because an essential element of any job is an ability to appear for work . . . ." *Id.* at *5; *see also Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) ("Because [employee] could not attend work, he is not a qualified individual with a disability under the ADA."( quotations omitted)); (*Villarreal*, 2021 WL 3525023, *5 (granting summary judgment in favor of employer where employee's inability to appear at work prevented her from being a "qualified individual" under the ADA); *Ormond*, 2021 WL 4307373, at *10 (finding the plaintiff "was not qualified to appear for work regularly and perform the essential functions of her job, even with her flexible schedule"); *Clark*, 952 F.3d at 583 (holding the plaintiff was not a "qualified individual" because he could not perform an essential function of his position, to maintain

-24-

alertness, which resulted in a violation of and termination under the company's policy).

Accordingly, even if American could have accommodated Milcent by permitting her 15-30 minute breaks whenever she needed them throughout the day and further allowing her multiple days off well in excess of the Attendance Policy—all at great burden to American's operations and its passengers—that would not allow her to perform the essential functions of her job—namely, "having regular and predictable attendance on site." App. 079. [Job Description for CSA.] *Willi v. Am. Airlines, Inc.*, 288 F. Appx. 126 (5th Cir. 2008) (even if American granted an accommodation permitting "unpredictable, unapproved, and unscheduled absences," it would not allow employees "to perform the essential job function of regular attendance"); *see also Green v. Medco Health Sols. of Tex.*, 560 F. App'x 398, 402 (5th Cir. 2014) ("[C]ourts have recognized that an accommodation that requires an employer to ignore prior misconduct, including a violation of an attendance policy, is not the kind of reasonable accommodation mandated under the ADA."). And given Milcent's excessive absences and need for unscheduled breaks, she also cannot perform the essential functions of her job *without* an accommodation. *See Acker*, 853 F.3d at 791. Thus, Milcent's claim fails for the additional reason that she was not a qualified individual under the ADA.

## CONCLUSION

For these reasons, American respectfully requests that the Court grant its Motion for Summary Judgment.

Dated: May 1, 2026

By:  */s/ Kelly S. Wood*

Russell D. Cawyer
State Bar No. 00793482
**Kelly Hart & Hallman LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:  (817) 332-2500
Facsimile:  (817) 335-2820
Email:  russell.cawyer@kellyhart.com

Mark W. Robertson (*pro hac vice*)
New York State Bar No. 4508248
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone:  (212) 326-2000
mrobertson@omm.com

Kelly S. Wood (*pro hac vice*)
California State Bar No. 267518
**O'Melveny & Myers LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone:  (949) 823-6900
Facsimile:  (949) 823-6994
Email:  kwood@omm.com

**ATTORNEYS FOR
AMERICAN AIRLINES, INC.**